[Civ. No. 1050. Fifth Dist. Jan. 6, 1970.]

STANLEY A. NEWMAN, as Administrator, etc., Plaintiff, Cross-defendant, and Appellant, v. EVERETT W. CORNELIUS et al., Defendants and Respondents; SIDNEY M. HEYSER et al., Defendants, Cross-complainants and Respondents.

**COUNSEL**

Lerrigo, Thuesen & Thompson and C. Richard Walters for Plaintiff, Cross-defendant and Appellant.

Siemon & Patterson, Bennett Siemon, Vizzard, Baker, Sullivan, McFarland & Long and Lawrence N. Baker, for Defendants and Respondents.

Walter L. Maas for Defendants, Cross-complainants and Respondents.

**OPINION**

**COAKLEY, J.**—This action in quiet title involves lands in the Piute Mountains of Kern County. The amended decree quieted appellant's title "to that certain land described by reference to the 1883 United States Government Survey . . . *except* only as to those certain mining claims hereinabove set forth, or any of them, as and to the extent any or all of same may be located upon said land."

The decree is deficient in these respects:

(1) It purports to quiet title to land described in an 1883 United States Government Survey, which survey the evidence establishes was incorrect and superseded by an official resurvey in 1943.[1]

---

[1]Complete confusion prevailed throughout the trial, and later at the hearing on appellant's motion for a new trial, as to the appropriate description of the land claimed by the appellant and by respondents, respectively.

As expressed by counsel for one set of respondents, "Our problem, your honor, really is that if this judgment is signed, as I see it, this really isn't going to solve

(2) The decree leaves hanging in mid-air the location of the mining claims of respondents, i.e., whether they lie within or outside the boundaries of the larger tract claimed by appellant, and as to which the court purported to quiet title in the appellant, subject to the rights of respondents.

The rule is settled concerning the purpose of a quiet title action.

■ "Applied to judgments, the rule is that the description in a judgment affecting real property should be certain and specific, and that an impossible, wrong, or uncertain description, or no description at all, renders the judgment erroneous and void." (*Newport* v. *Hatton,* 195 Cal. 132, 156 [231 P. 987].)

■ "The object of the action is to finally settle and determine, as between the parties, all conflicting claims to the property in controversy, and to decree to each such interest or estate therein as he may be entitled to." (*Peterson* v. *Gibbs,* 147 Cal. 1, 5 [81 P. 121, 109 Am.St.Rep. 107].)

The court is directed to determine and state in which tract and township, or section and township, the land of the appellant, and the mining claims of the respective respondents are located. This shall be done with specific reference to tract 40 of township 29, delineated on the official United States Government Resurvey dated March 3, 1943, rather than by reference to the survey of 1883. This court believes that this aspect of the case can be resolved on the basis of the present record. However, on retrial, if this issue cannot be so resolved, the court should require the testimony of a person or persons qualified in reading and interpreting maps and surveys. In any event, the court must locate appellant's land using the 1943 resurvey for that purpose, and, then, determine which mining claims of the various respondents are located within the boundaries of appellant's land, adequately describing the same. (See *Lind* v. *Baker,* 31 Cal.App.2d 631 [88 P.2d 777], wherein the same procedure was recommended.) The court must do so on the basis of competent evidence. The testimony of persons not qualified should not be received on this aspect of the case, including the testimony of Mr. and Mrs. Heyser, respondents. Though acknowledging that they had no experience in such matters, they were permitted to compare and to attempt to reconcile maps and to express

---

anything as far as record title is concerned." The court: "No." And later, by the court, "I think it [signing the decree as prepared in accordance with the findings] is a meaningless act." Nevertheless, the criticized decree was signed. It constitutes the basis of this appeal.

At the oral argument before this court, counsel, speaking on behalf of all respondents, acknowledged, with admirable candor, that no title company would insure title on the basis of the judgment and that another or other quiet title actions would be necessary to resolve the confusion.

opinions with respect thereto. Not only were they not qualified to do so, but much of their testimony on this aspect of the case was based upon hearsay.

■ A second and more difficult question is presented upon this appeal. The judgment awarded respondents title to their several mining claims, describing them as they are described in the notices of location recorded at the time the claims were initially discovered and located. The court's Memorandum of Decision, to which we may refer for clarification of the findings and judgment (*McBain* v. *Santa Clara Sav. & Loan Assn.*, 241 Cal.App.2d 829, 840 [51 Cal.Rptr. 78]), recites that respondents have occupied appellant's land for mining purposes. It is silent as to ownership in fee. The conclusions of law speak only of mining claims and not of fee title. The findings as to some respondents find adverse possession as to mining claims only, being silent as to fee ownership. As to other respondents, the findings are ambiguous in that they speak both of ownership of the land and also of ownership of mining claims, with respect to identical parcels of land. Although some of the respondents argue that point in their closing briefs, none appealed from the judgment awarding them mining claims only, as distinguished from ownership in fee. Notwithstanding the amended pleadings of certain respondents, i.e., to claim ownership of the land in fee as distinguished from claims for mining purposes only, we believe that the court correctly viewed the case as one in which the issue, at best, was whether the respondents, or any of them, had acquired the right to occupy appellant's land for purposes of holding mining claims, and not for purposes of acquiring title in fee. We so construe the court's Memorandum of Decision, the findings (despite ambiguities), the conclusions of law, and the judgment.[2]

### The Facts

The chain of record title shows: (1) a patent from the United States to the Southern Pacific Railroad Company, September 30, 1896; (2) a deed from Southern Pacific to Scofield (appellant's decedent), July 11, 1899; (3) a deed of relinquishment from Scofield to the United States, July 17, 1899; and (4) a quitclaim deed from the United States to Scofield, February 13, 1958, recorded April 4, 1958.

[2]There were several firms of attorneys representing the various respondents. Understandably, therefore, there are differences of wording in the answers, the amended answers, the cross-complaints and in the separate findings and conclusions prepared by respective counsel. Basically, however, the issues are the same as to all respondents. Any attempt to deal with the distinctions in the body of this opinion would lead to much confusion, as it did below. For the sake of clarity, therefore, we will treat all respondents as being in the same position. We shall leave to the court below, on retrial, the question of which respondents have and which have not met all the conditions required for acquiring rights by adverse possession as prescribed herein.

Scofield's deed of relinquishment was executed and recorded pursuant to the "Forest Lieu Lands Act" (30 Stat. 36), which was enacted on June 4, 1897, reading as follows: "That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the Government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent."

In 1930, Congress authorized the Secretary of Interior to quitclaim to the party or parties entitled thereto, lands theretofore relinquished to the United States under the Forest Lieu Lands Act, *supra,* when an application for an exchange of lands was thereafter withdrawn or rejected. (46 Stat. 257 (1930), 43 U.S.C. § 872.)

The exchange initiated by Scofield in 1899 was never completed, i.e., Scofield did not receive any land in lieu of the land which he deeded to the United States on July 17 of that year.

On February 13, 1958, pursuant to section 872 of title 43 of the United States Code, *supra,* the United States executed, in favor of Scofield, a quitclaim deed to the land which Scofield had conveyed to the United States in July 1899, by his deed of relinquishment. This quitclaim deed was recorded in Kern County on April 4, 1958.

Between 1932 and 1950, and while the land was then of record in the name of the United States, the predecessors in interest of the several respondents[3] entered upon the land and took up mining claims. The respondent parties to this action purchased their respective mining claims between 1952 and 1962, and received quitclaim deeds. All of the deeds described the property as a mining claim or claims. Thus, some of the respondents have occupied the land without interruption for more than twenty years, all for more than five years. There is no evidence that any respondent had any actual, as distinguished from constructive, knowledge of the in lieu character of the government's title. There is no evidence that Scofield or his representative, including his administrator, ever visited the property or had actual knowledge of the respondents' occupancy until 1958. Appellant did, however, have constructive notice through respondents' recordation annually of their proofs of labor. (Pub. Resources Code,§§ 2314, 2315.)

All respondents believed they occupied land in the public domain. They located their claims, did their discovery work, recorded notices of location and annual proofs of labor, all as required by state and federal laws

---

[3]Respondents, together with their predecessors in interest, are herein called respondents.

for locating mining claims upon public lands. (30 U.S.C.A. § 28; Pub. Resources Code, § 2301 et seq.) They improved the property by the construction of one- to three-room cabins and miscellaneous other structures, such as outhouses and chicken coops. They also did some road work. Due to severe weather conditions, the several properties were inaccessible in winter by ordinary and usual means. During the spring and summer some respondents spend every other weekend on the property, and one has resided there since 1961. During the winter, the latter gets in and out once a week with a four-wheel drive vehicle, aided by shoveling. There was evidence of mining activity by many persons in the area over the years, but no respondent ever extracted ore of greater than nominal value. Some, though not all, testified that they believed the land to be mineral land. There was testimony by a qualified engineer and geologist, a senior member of the American Institute of Mining, Metallurigical and Petroleum Engineers, that there was some indirect evidence of small placer diggings in the general area perhaps 60 or 70 years ago; he found no evidence, however, of minerals being present in an amount that would cause a prudent person to attempt to mine the property with a reasonable prospect of doing so profitably. It was his opinion that this was equally true in 1937 as it was at the time of trial. No evidence was offered to refute the expert testimony other than that of the respective owners, none of whom qualified as experts in geology, mineralogy, or mining.

All taxes levied in connection with the property prior to 1958 were paid by respondents. These taxes were described on the tax bills of Kern County as a tax on "possessory interest in the mining claims,"[4] naming the claim. No real property taxes were assessed or paid until 1959. This is because the property stood in the name of the United States until the government's quitclaim deed in favor of the appellant was recorded in 1958. Thereafter, real property taxes were assessed to, and paid by, the appellant. Respondents continued to pay all possessory interest taxes levied to the time of trial.

### Legal Theories of the Parties

Respondents assert ownership by adverse possession pursuant to Code of Civil Procedure section 322 and its companion section 323.[5]

---

[4]Possessory interest taxes are treated as personal property taxes. (See Rev. & Tax. Code, § 107 and the annotations thereto in West's Annotated California Codes and the Code Commission Notes.)

[5]Code of Civil Procedure section 322 provides: "OCCUPATION UNDER WRITTEN INSTRUMENT OR JUDGMENT, WHEN DEEMED ADVERSE. When it appears that the occupant, or those under whom he claims, entered into the possession of the property under claim of title, exclusive of other right, founding such claim upon a written instrument, as being a conveyance of the property in question, . . . and that there has

It is the appellant's position that respondents acquired no interest of any character against appellant's land for these reasons:. first, that respondents never purported to occupy the land adversely to anyone until 1958, or later; that respondents believed the land belonged to the United States, and at all times acknowledged they could not acquire title adversely to the United States; and since respondents were unaware of appellant's ownership or interests, they cannot be said to have been occupying adversely to appellant. Second, appellant contends that because the land is not mineral land, it cannot be claimed for mining purposes despite continuous and allegedly adverse occupancy for the statutory period.

## The Law

We first consider the law applicable to adverse possession, generally.

■ "To establish title by adverse possession, the claimant must establish five elements in connection with his occupancy of the property. [Citations.] (1) Possession must be by actual occupation under such circumstances as to constitute reasonable notice to the owner. [Citations.] (2) Possession must be hostile to the owner's title. [Citations.] (3) The holder must claim the property as his own, either under color of title, or claim of right. [Citations.] (4) Possession must be continuous and uninterrupted for five years. [Citations.] (5) The possessor must pay all of the taxes levied and assessed upon the property during the period. [Citations.] Unless each one of these elements is established by the evidence, the plaintiff has not acquired title by adverse possession." (*West* v. *Evans,* 29 Cal.2d 414, 417 [175 P.2d 219]; see *Unger* v. *Mooney,* 63 Cal. 586 [49 Am.Rep. 100].)

■ Examining each of the five requirements for adverse possession in relation to the evidence, and with particular reference to appellant's contention that respondents' occupation was not hostile to the appellant, we observe and hold:

(1) *Actual occupation.* This is not disputed.

(2) *Hostile possession.*

---

been a continued occupation and possession of the property included in such instrument, . . . under such claim, for five years, the property so included is deemed to have been held adversely . . . ."

Code of Civil Procedure section 323 provides: "WHAT CONSTITUTES ADVERSE POSSESSION UNDER WRITTEN INSTRUMENT OR JUDGMENT. For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument, . . . land is deemed to have been possessed and occupied in the following cases:

"

"3. Where . . . it has been used for the . . . ordinary use of the occupant; . . . ."

■ "The requirement of hostility means, not that the parties must have a dispute as to the title during the period of possession or that there is open aggression or combat, but that the claimant's possession must be adverse to the record owner, unaccompanied by any recognition, express or inferable from the circumstances, of the right in the latter. The possession must not only operate as an ouster of the holder of the legal title; but the title must be claimed as against the true owner during the entire statutory period." (2 Cal.Jur.2d, Adverse Possession, § 46, pp. 551-552.)

■ Thus it has been held that one who occupies the land of another in the mistaken belief that he, and not some other person, is the owner, doing so openly for the statutory period, and paying all taxes levied against the land, acquires title by adverse possession. His occupancy is deemed hostile as against the world, including the true owner, unless that owner be the sovereign. (*Sorensen* v. *Costa,* 32 Cal.2d 453 [196 P.2d 900]; *Woodward* v. *Faris,* 109 Cal. 12 [41 P. 781].)

■ In what we consider to be a well-reasoned opinion on the basic issue in this case, the Supreme Court of Oregon had this to say: "In view of the authorities here cited, and especially in the light of the views so lately expressed by the highest tribunal of the nation, we now hold that one claiming title to land by adverse possession for a period of 10 years as against all persons, but recognizing the superior title of the United States government, and seeking in good faith to acquire that title, may assert such adverse possession as against any person claiming to be the owner under a prior grant." (*Boe* v. *Arnold,* 54 Ore. 52 [102 P. 290, 295, 20 Ann.Cas. 533].)

In *LeFevre* v. *Borwick,* 116 Cal.App.2d 786, 789 [254 P.2d 626], the court said: ". . . a person may obtain title by adverse possession where such party claims title against the entire world excepting the government." Also, in *Allen* v. *McKay & Co.,* 120 Cal. 332, 337-338 [52 P. 828], the court held: "They rested their cause of action upon a patent from the state. They were out of possession, and had nothing but a paper title upon which to base their action. If they had sufficient title upon which to base the action, then they had a title which could be lost by an adverse possession. If the land in controversy was not private property, plaintiffs had no title. If it was private property, there certainly could be an adverse occupancy of it for the statutory period."

■ Applying the principles of *Sorensen, Woodward, Boe, LeFevre* and *Allen* to our case, we hold that respondents' mistaken belief that the United States owned the land was not a bar to their holding adversely as against all others, including appellant.

(3) *Claim to property under color of title.*

■ Respondents' claims are founded upon written instruments, i.e., quitclaim deeds. It was held in *Lundy* y. *Lakin,* 96 Cal.App.2d 221 [215 P.2d 61], that the grantee under a deed quitclaiming to him all rights of the grantor in mining land acquires at least color of title which can ripen into actual title by adverse possession. This assumes, of course, an absence of fraud or bad faith. (*Madden* v. *Alpha Hardware & Supply Co.,* 128 Cal.App.2d 72 [274 P.2d 705]; *Satariano* v. *Galletto,* 66 Cal.App.2d 813, 816 [153 P.2d 201].)

(4) *Continuous and uninterrupted possession for five years.*

■ Respondents' occupation was uninterrupted for well over five years prior to 1958. The property is in a mountainous area, virtually inaccessible except in the spring and the summer. The evidence is that the respondents went upon their premises during the spring and summer of each year, residing thereon for two or three days, and sometimes longer, on each visit.

■ "If but slight use can be made of land claimed adversely, then the requirements of continuous and uninterrupted occupancy are satisfied, if such slight use as can be made is made thereof. This is the plain meaning of the clause 'for the ordinary use of the occupant'; it means a use appropriate to the location and character of the property, each case resting upon its own particular facts. [Citations.]" (*Posey* v. *Bay Point Realty Co.,* 214 Cal. 708, 712 [7 P.2d 1020].)

■ "It is not essential to such continuity, in every case, that there shall be a continuous personal presence on the lot of some person holding for the adverse claimant. It is enough, under the code, that it is devoted to 'the ordinary use of the occupant,' where the possession is under color of title as it is here. (Code Civ. Proc., sec. 323, subds. 3, 4.) . . . Constant occupancy and use is not always required. It depends on the character of the property and the use to which it is adapted." (*Montgomery & Mullen Lbr. Co.* v. *Quimby,* 164 Cal. 250, 253 [128 P. 402].)

■ We hold that the requirement of continuous and uninterrupted possession for five years has been met. We hold further that using land in a mountainous area for summer and weekend recreation purposes, coupled with a modest effort to extract gold, albeit not in commercial quantities, constitutes "an ordinary use" of such land.

(5) *Payment of all taxes levied against the property.*

■ As noted earlier, the only taxes levied in connection with the property prior to 1958 were the possessory interest taxes levied on the named mining claims of the respondents. These were paid by them. No

real property taxes were levied until after 1958. Therefore, respondents paid all taxes levied prior to 1958.[6]

"As no taxes were assessed against said strip . . . this of itself would not prevent them from acquiring title by adverse possession." (*Brown* v. *Bachelder*, 214 Cal. 753 [7 P.2d 1027]; 2 Cal.Jur.2d, Adverse Possession, § 65, p. 570.)

We hold, therefore, that prior to 1958 some of the respondents appear to have fulfilled all of the conditions required under general rules for obtaining title by adverse possession.

We now consider appellant's second contention, namely, that if the land is not, in fact, mineral land, one occupying it as a mining claim, however long, acquires no right to occupy the land for that or any other purpose. The court's Memorandum of Decision expresses doubt as to the mineral character of the land, but the court made no finding on this question though requested to do so by appellant.

It is true that as to lands in the public domain one cannot validly claim land as a mining claim if it is not, in fact, mineral land. Thus, in *United States* v. *Mobley* (S.D.Cal. 1942) 45 F. Supp. 407, a case involving the Sierra National Forest in California, the court held at page 409: "A mining location confers rights only (1) when there is a discovery of minerals in (2) such quantities as would justify a person of ordinary prudence to expend his money and labor with a reasonable assurance of success.

"Mere outcroppings, whether appearing on the surface or in shallow works near the surface, do not satisfy the quantum of discovery. [Citations, numerous cases including several decisions of the United States Supreme Court.]" (See *Cameron* v. *United States*, 252 U.S. 450 [64 L.Ed. 659, 40 S.Ct. 410]; *Chrisman* v. *Miller*, 197 U.S. 313 [49 L.Ed. 770, 25 S.Ct. 468]; *Veale* v. *Piercy*, 206 Cal.App.2d 557, 564 [24 Cal.Rptr. 91]; *Kramer* v. *Sanguinetti*, 33 Cal.App.2d 303, 308 [91 P.2d 604].)

Appellant argues that the same rule should be applied to land held in private ownership. He cites no authority. Independent research has produced a text reference and the cases referred to in the footnote.[7] We believe that all are distinguishable from our case and are not controlling.

---

[6]This may not be true as to respondent Marrs.

[7]Ricketts, American Mining Law, published by the State of California Division of Mines, Bulletin No. 98, January, 1931, contains this statement at page 193 of section 331: "Adverse possession of nonmineral land under a claim of a mining title will not ripen into a title in fee by prescription under a state statute of limitations, as appropriate use must be shown."

The author cites only *Adams* v. *C. A. Smith Timber Co.* (9th Cir. 1921) 273 F.

The following language appears in *Hullinger* v. *Big Sespe Oil Co.,* 28 Cal.App. 69, 73 [151 P. 369]: "The argument of the plaintiff that the title of the defendant under mining location merely, without discovery of minerals, was totally invalid and of no effect, is true only in a qualified sense. This title by such location and possession was good as against every person contending against it, except the paramount owner, to wit: the government of the United States."

We point out that in our case the United States was not the owner of the land, though record title was in its name during respondents' occupancy and until 1958. Appellant, at all times, was the owner of both the legal and equitable title. This anomalous situation existed because of the in lieu nature of the transaction. ▋ It has been uniformly held that recordation of an owner's in lieu deed to the United States is in the nature of an offer and application to the United States to exchange private land for government land. Until the in lieu selection is made and the exchange consummated, title to the privately owned land does not pass to the government, and both the legal and equitable title remain in the private owner. (See *Roughton* v. *Knight,* 219 U.S. 537 [55 L.Ed. 326, 31 S.Ct. 297]; *Roughton* v. *Knight,* 156 Cal. 123 [103 P. 844]; *Rosenberg* v. *C. W. Clarke Co.,* 200 Cal.App.2d 178 [19 Cal.Rptr. 191]; *State* v. *Hyde,* 88 Ore. 1 [169 P. 757, 171 P. 582].)

▋ We hold, therefore, that the fact, if it be a fact, that the land occupied by the respondents is not mineral land[8] is not a bar to the right of the respondents to continued occupancy of the so-called mining claims; more specifically, occupancy of the land embraced within the boundaries of the claims as described in the claimants' notice of location.

We conclude that those respondents who have satisfied all of the conditions set forth in *West* v. *Evans, supra,* 29 Cal.2d 414, 417, as interpreted herein, are entitled to judgments recognizing their right to occupy the land described in their recorded notices of location. This, in effect, is what the court below purported to do. But there is confusion in the record

---

652. That case stands for the proposition, only, that the adverse claimant had not made appropriate use of the property and, therefore, could not prevail. It did not discuss the subject of whether it was bona fide mineral land. The brief statement of facts strongly suggests that the court was of the opinion that there had been nothing but token occupancy by the adverse claimant and his alleged caretaker. *Adams* cites three early California cases: *English* v. *Johnson,* 17 Cal. 107 [76 Am. Dec. 574]; *Coryell* v. *Cain,* 16 Cal. 567; *Brumagim* v. *Bradshaw,* 39 Cal. 24. We have examined them and find nothing therein indicating that there was an issue in any of those cases as to whether the land was mineral land.

[8]For the purpose of perfecting a patent or for the purpose of occupying public domain lands as a mining claim.

as to which respondents have, and which have not, satisfied all of said conditions. The court below is directed to make that determination.

What constitutes ownership by adverse possession of a right to occupy land embraced within a so-called mining claim, as distinguished from ownership in fee by adverse possession of the area within the mining claim, is not an issue on this appeal. Accordingly, we refrain from pronouncing dicta on the subject, albeit the distinction may be an intriguing one to consider.

Appellant's contention that respondents have forfeited whatever interest they claim in appellant's land, because appellant, and not respondents, has paid all taxes levied on the real property (as distinguished from possessory interest taxes) since 1958 is without merit for these reasons: (1) Respondents, or some of them, acquired the right to occupy the land described in their respective notices of location by adverse possession prior to 1958. They continued in uninterrupted physical possession to the time of trial. No case has been cited, and we know of none, which would authorize a court to quiet title in appellant under such circumstances. (2) All possessory interest taxes levied upon their so-called mining claims have been paid by respondents.

The case is remanded for retrial in accordance with the principles laid down herein.

Stone, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 4, 1970.