[No. H032750. Sixth Dist. Nov. 21, 2012.]

CITY OF SANTA MARIA et al., Cross-complainants, Cross-defendants and Respondents, v.
RICHARD E. ADAM et al., Cross-defendants, Cross-complainants and Appellants;
GOLDEN STATE WATER COMPANY et al., Cross-defendants, Cross-complainants and Respondents;
NIPOMO COMMUNITY SERVICES DISTRICT et al., Cross-defendants and Respondents. [And three other cases.*]

*City of Santa Maria v. Adam (No. H033544); City of Santa Maria v. Adam (No. H034362); City of Santa Maria v. Adam (No. H035056).

274

## COUNSEL

Clifford & Brown, Richard G. Zimmer; and E. Stewart Johnston for Cross-defendant, Cross-complainant and Appellant Richard E. Adam.

Frame & Matsumoto and Ted R. Frame for Cross-defendant, Cross-complainant and Appellant Edward Wineman.

Best Best & Krieger, Jeffrey V. Dunn, Eric L. Garner and Jill N. Willis for Cross-complainants, Cross-defendants and Respondents.

Brownstein Hyatt Farber Schreck and Robert J. Saperstein for Cross-defendants, Cross-complainants and Respondents.

Arnold Bleuel LaRochelle Mathews & Zirbel, Robert S. Krimmer; Brownstein Hyatt Farber Schreck and Robert J. Saperstein for Cross-defendant and Respondent Rural Water Company.

Richards Watson & Gershon and James L. Markman for Cross-defendant and Respondent Nipomo Community Services District.

Baker Manock & Jensen, Christopher L. Campbell, Grace I. Liu, Amanda M. Neal; Nossaman, Guthner Knox & Elliott, Nossaman and Henry S. Weinstock for Cross-defendants and Respondents City of Guadalupe and City of Pismo Beach.

Baker Manock & Jensen, Christopher L. Campbell; Burke Williams & Sorensen and Mark J. Mulkerin for Cross-defendant and Respondent City of Guadalupe.

Kronick, Moskovitz, Tiedemann & Girard and Janet K. Goldsmith for Cross-defendant and Respondent County of San Benito.

Kevin E. Ready, Sr., County Counsel, and Stephen D. Underwood, Chief Assistant County Counsel, for Cross-defendant and Respondent County of Santa Barbara.

Nossaman, Guthner Knox & Elliott, Nossaman and Henry S. Weinstock for Cross-defendants and Respondents City of Grover Beach, City of Arroyo Grande and Oceano Community Services District.

## OPINION

**PREMO, Acting P. J.**—This appeal concerns rights to groundwater contained in the Santa Maria Valley Groundwater Basin (Basin). The Basin suffered severe water shortages beginning around the 1930's but the importation of water from outside the watershed and the local construction of dams and reservoirs relieved the historical water shortage. As a result, groundwater levels have been relatively stable for the last 30 years or so. Nevertheless, there is concern that aging reclamation facilities and growing population could lead to more shortages in the future. This litigation was commenced to identify and prioritize the water rights held by the many users of Basin groundwater. Most of the case was resolved by an agreement (Stipulation) among the Santa Maria Valley Water Conservation District (District), local cities and water companies (public water producers), and most of the owners of land overlying the Basin. The Stipulation contains a plan, referred to as a physical solution, which resolves conflicting water rights claims and allocates the various components of the groundwater (native groundwater, return flows of imported water, and salvaged water) among the stipulating parties. It also sets up a comprehensive Basin-wide groundwater management program that calls for continuing judicial oversight.

Appellants are two groups of landowners, mostly farmers, identified as the "Landowner Group" (the LOG parties) and the "Wineman parties," who extract groundwater for agricultural use upon their lands. Respondents are public water producers that pump groundwater for municipal and industrial use by their citizens and customers.[1] Appellants did not join the Stipulation and went to trial against respondents in an effort to quiet title to their prior rights to water in the Basin. Appellants also objected to terms in the Stipulation that they claim affected them.

The trial court approved the Stipulation and made it part of the final judgment. The court rejected appellants' quiet title claims, finding that two of the public water producers had perfected prescriptive rights in the Basin's native groundwater. The court recognized that appellants might have preserved a prior right to some volume of groundwater by continuing to pump

---

[1] We have received three respondents' briefs. The City of Santa Maria (Santa Maria), Golden State Water Company (GSWC), the Nipomo Community Services District (Nipomo), the Cities of Arroyo Grande and Grover Beach, the Oceano Community Services District (Oceano), and the Rural Water Company have filed a joint brief. Respondents City of Guadalupe (Guadalupe) and City of Pismo Beach (Pismo Beach) have filed their own briefs.

during the prescriptive period but, because appellants had been unable to prove the amount of water they had pumped in the past, the court concluded that the quiet title remedy was not available.

On appeal, appellants challenge the trial court's approval of the Stipulation, arguing that the physical solution was unnecessary because there is no present water shortage. They attack the sufficiency of the evidence in support of the award of prescriptive rights and argue, in the alternative, that any prescriptive rights acquired years ago have been lost by nonuse. Appellants also maintain that the trial court erred in refusing to declare their overlying rights to be paramount and in its allocation of return flows and salvaged water to respondents. We will conclude as follows:

(1) The trial court properly exercised its equitable powers to approve the physical solution proposed by the stipulating parties. The present existence of a water shortage is not a prerequisite to imposition of a physical solution.

(2) The evidence is sufficient to support the trial court's finding that Santa Maria and GSWC have perfected prescriptive rights, giving these public water producers a prior right to a specified volume of groundwater in the event of a future water shortage. Although recent water surpluses make it unnecessary to assert that priority, the prescriptive rights have not been extinguished by nonuse. (Civ. Code, § 811, subd. 4.) The right is the right to take groundwater; disuse occurs only when the holder of the right stops taking the water.

(3) Because there is no present need to allocate the native groundwater, it is unnecessary to quantify appellants' overlying rights. Appellants are entitled to a judgment declaring their overlying rights to be prior to all appropriative rights in the native groundwater, less the volume to which Santa Maria and GSWC are entitled pursuant to their prescriptive rights.

(4) The trial court did not err in approving the stipulating parties' allocation of return flows and salvaged water. Appellants have no claim to either. We do find, however, that the judgment must be clarified to insure that respondents' priority right to the salvaged water does not exceed the amount of water actually saved.

We reject the remainder of appellants' arguments, reverse the judgment, and remand with directions as specified below.

## I. WATER LAW PRINCIPLES

The California Constitution sets general state water policy. The 1928 amendment to the California Constitution, now article X, section 2 (article X,

section 2),[2] limits all water rights in this state "to reasonable and beneficial uses." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1241 [99 Cal.Rptr.2d 294, 5 P.3d 853] (*Mojave*); see Wat. Code, § 100.) Individuals may have a right to use water but "[a]t least since 1928 when the predecessor to article X section 2 of the California Constitution was adopted, there [has been] no private ownership of groundwater. (*State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1023, 1025 [93 Cal.Rptr.2d 276].) The State of California owns all of the groundwater in California, not as a proprietary owner, but in a manner that empowers it to supervise and regulate water use. (*Id.* at pp. 1022, 1026.) Water rights holders have the right to 'take and use water,' but they do not own the water and cannot waste it. (*Id.* at p. 1025.)" (*Central and West Basin Water Replenishment Dist. v. Southern Cal. Water Co.* (2003) 109 Cal.App.4th 891, 905 [135 Cal.Rptr.2d 486] (*Central and West Basin*); see Wat. Code, § 102.)

■ Other water policy is contained in the Water Code. Pertinent here is Water Code section 106, which provides that it is "the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation." Municipalities are granted special legislative protection by Water Code section 106.5, which states that it is "the established policy of this State that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for existing and future uses . . . ." Surface water is subject to a statutory system of permits and licenses regulating its appropriation. (Wat. Code, § 1200.) There is no statewide system for allocating rights in groundwater. The Legislature has left that to local government or, as here, to adjudication by the courts. (*O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 587–588 [86 Cal.Rptr.3d 1].)

■ "Courts typically classify water rights in an underground basin as overlying, appropriative, or prescriptive." (*Mojave, supra,* 23 Cal.4th at p. 1240.) The overlying right, like the riparian right, is associated with the ownership of land. "Overlying rights are special rights to use groundwater under the owner's property." (*Id.* at p. 1237, fn. 7.) Appropriative rights, on the other hand, are not derived from land ownership but depend upon the actual taking of water. "Public interest requires that there be the greatest number of beneficial users which the supply can yield, and water may be appropriated for beneficial use subject to the rights of those who have a

---

[2] Article X, section 2 provides, in pertinent part: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. . . ."

lawful priority [citation]. Any water not needed for the reasonable beneficial use of those having prior rights is excess or surplus water and may rightly be appropriated on privately owned land for non-overlying use, such as devotion to public use or exportation beyond the basin or watershed [citation]. When there is a surplus, the holder of prior rights may not enjoin its appropriation." (*California Water Service Co. v. Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715, 725 [37 Cal.Rptr. 1] (*California Water Service*).)

■ Although an appropriator is entitled to take groundwater that the overlying landowner does not need, the appropriator is limited to the remainder of the "safe yield." (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 214 [123 Cal.Rptr. 1, 537 P.2d 1250] (*San Fernando*).) The safe yield is "the maximum amount of water that could be extracted annually, year after year, without eventually depleting the underground basin." (*Ibid.*) Safe yield is generally calculated as the net of inflows less subsurface and surface outflows. (*Id.* at pp. 278–279.) When total extractions exceed the safe yield the basin is said to be in overdraft. (*Id.* at p. 280.)

When the safe yield is insufficient to satisfy the reasonable and beneficial needs of all users, those with overlying rights take precedence. As among overlying owners, the rights are correlative. "[E]ach may use only his reasonable share when water is insufficient to meet the needs of all." (*California Water Service, supra,* 224 Cal.App.2d at p. 725.) As among appropriators, those first in time are first in right. (*Id.* at p. 726.) Prescriptive rights arise when an appropriator continues to pump water during times of overdraft. "An appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right." (*Ibid.*)

Overlying landowners who fail to seek an injunction preventing an adverse use may nevertheless protect their interests by means of self-help. Self-help in this context requires the landowner to continue to pump nonsurplus water concurrently with the adverse users. When they do, the landowners retain their overlying rights, losing only the amount of the prescriptive taking. (*Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc.* (1994) 23 Cal.App.4th 1723, 1731–1732 [28 Cal.Rptr.2d 909], citing *San Fernando, supra,* 14 Cal.3d at p. 293 & *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 931–933 [207 P.2d 17] (*Pasadena*).)[3]

---

[3] A peculiar type of water right is the pueblo right, which, although not at issue here, deserves some mention. The pueblo right gives the municipality holding it a "paramount claim to particular waters" required to satisfy the needs of the municipality and its inhabitants. (*San Fernando, supra,* 14 Cal.3d at p. 252.) It takes priority over all other rights in the water source and it applies to surface and groundwater both. Pueblo rights are held only by the municipal

## II. FACTS

The Basin at the center of this case is a coastal groundwater basin underlying about 163,700 acres that straddle the line between Santa Barbara and San Luis Obispo Counties. It extends from Santa Barbara County northwest beyond the Nipomo Mesa to what the parties refer to as the "Northern Cities" area.[4] It contains three hydrological subareas identified at trial as the Santa Maria Valley, Nipomo, and Northern Cities subareas. The Basin is the principal source of water for thousands of residents and landowners. According to California's Department of Water Resources, groundwater satisfies a greater percentage (83 percent) of the agricultural and urban demand in the central coast area than it does in any other part of the state. (Department of Water Resources, Bulletin 118-Update 2003, p. 115.)[5]

This case concerns three sources of groundwater: native groundwater (rainfall, natural infiltration from lakes and streams, and other natural inflows), return flows (imported water that is used on the surface which then percolates into the Basin), and salvaged water (water that would have wasted to the sea during the rainy season but for the dams and reservoirs that capture and save it). Return flows in the Basin are derived from State Water Project (SWP) water imported by several of the public water producers. Salvaged water is contributed by the Twitchell Dam and Reservoir in the Santa Maria Valley area and the Lopez Dam and Reservoir in the Northern Cities area. We shall refer to return flows and salvaged water collectively as "developed" water.

Much of the dispute in the instant case concerns the Twitchell project. The Twitchell project was conceived to address a long history of critical water shortages in the Basin. In 1945, persistent water shortages and concern about seawater intrusion led Santa Barbara County to establish the Santa Barbara County Water Agency (SBCWA). In 1954, Congress passed Public Law 774, authorizing the United States Department of the Interior, Bureau of Reclamation (Bureau of Reclamation), to contract with SBCWA for construction of the Vaquero (now Twitchell) Dam and Reservoir on the Cuyama River, a tributary of the Santa Maria River. As is true of many California rivers, the highest flow of the Cuyama and Santa Maria Rivers happens following storms during the rainy season. If not collected behind dams and stored in reservoirs, most of these high flows would waste to the sea in the winter and

successors to Mexican and Spanish pueblos. (*Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 751 [72 Cal.Rptr.2d 1].)

[4] The Northern Cities parties are the cities of Arroyo Grande, Grover Beach and Pismo Beach and the Oceano Community Services District.

[5] <http://www.water.ca.gov/groundwater/bulletin118/bulletin118update2003.cfm> (as of Nov. 21, 2012).

the rivers would run low or dry in the summer months. Storing the water in a reservoir can augment the groundwater supply two ways. It may add to the groundwater directly by facilitating increased infiltration from the reservoir and from streambeds that can be kept running throughout the dry season. It may also limit pumping of groundwater by piping the salvaged water directly to users. The Twitchell project was intended to operate only by increasing infiltration. The plan was for it to save floodwater during the rainy season and release it "in such manner and at such times as will provide maximum contributions to the ground water supplies . . . ."

Because river water is surface water, the Bureau of Reclamation had to obtain a license from the State Water Resources Control Board (SWRCB) to appropriate the seasonal flows of the Cuyama River. The District was formed and given the perpetual right to use the water the project made available. The project was completed in about 1962. The District has operated the project ever since, levying assessments for the project's construction and routine maintenance. The District does not pump water from the Basin and it does not distribute water from the reservoir.

The Lopez Dam and Reservoir in the Northern Cities area was built around the same time as the Twitchell project. Its construction and operation has been governed by agreements among the Northern Cities and related entities. It, like Twitchell, adds to the groundwater supply by infiltration from the reservoir and streambeds. It also pipes some water from the reservoir directly to users.

Completion of the Twitchell and Lopez projects, the importation of SWP water by several appropriators in the area, and a leveling off of agricultural development have contributed to stabilizing water levels in the Basin. Groundwater levels have been relatively stable since the late 1960's, reaching near historic highs in 1967. By 1997, the Basin had been in equilibrium for many years. Nevertheless, the District became concerned about future supplies. Urban population was growing. Overpumping had continued in the Nipomo area where there is no reclamation project. And the Twitchell Reservoir has been accumulating silt, which reduces its capacity and threatens to diminish its ability to augment natural recharge.

### III. PROCEDURAL BACKGROUND

#### A. Initial Phases[6]

The District commenced this lawsuit in 1997 when it sued Santa Maria, Southern California Water Company (now known as GSWC), Guadalupe, and

---

[6] The case was originally filed in San Luis Obispo County but venue was transferred to Santa Clara County early in the process.

3,000 Doe defendants. The action was principally an effort to adjudicate rights in Basin groundwater. Subsequent complaints or cross-complaints brought in other public water producers, including the Northern Cities, Nipomo, Rural Water Company, and most of the landowners, appellants among them, who claimed a right to Basin groundwater. Appellants raised several claims against the public water producers, including a claim to quiet title in their overlying right to the groundwater.

The matter was tried in five phases. Basin boundaries were adjudicated in phases I and II. Phase III explored the question of whether the Basin was in overdraft. The trial court concluded that the Basin was not in a condition of overdraft and had not suffered overdraft in the past. The court did not calculate the safe yield but decided instead that the Basin's physical condition did not show the adverse effects one would expect from a long-term overdraft. Absent an overdraft, the public water producers could not have acquired prescriptive rights.

## B. The Stipulation

Before the phase IV trial commenced, the public water producers and most of the landowners other than appellants entered into the Stipulation. The Stipulation specifies that all stipulating landowners have a paramount overlying right to the groundwater, the public water producers have no prescriptive rights against stipulating landowners and have appropriative rights only to native groundwater that is surplus to the reasonable and beneficial needs of the stipulating landowners. In short, the Stipulation gives the stipulating parties the same rights in groundwater that they would have under the common law except that it eliminates any prescriptive rights adverse to the stipulating landowners that the public water producers may have perfected in the past. The Stipulation does not quantify the overlying or appropriative rights.

The Stipulation contains a physical solution dividing the Basin into three management areas corresponding to the three hydrological subareas. It sets forth detailed criteria for monitoring and managing groundwater in each management area, calling for the creation of technical committees or employment of a management area engineer to conduct the management programs. As to each of the three management areas, the Stipulation describes the factors used to identify a water shortage and the responses that must be taken. The Stipulation provides for continuing judicial oversight.

The Santa Maria Valley management area is the largest of the three management areas described in the Stipulation and is the subject of several issues raised in this appeal. The groundwater management plan for this area

focuses upon the Twitchell project and calls for the creation of the Twitchell Management Authority (TMA), the members of which are the District, Santa Maria, GSWC, Guadalupe, and stipulating landowners located within District boundaries. The Stipulation specifies that, on average, the Twitchell project adds 32,000 acre-feet per year to the Basin. The Stipulation refers to this volume as the "Twitchell Yield" and allocates 100 percent of the Twitchell Yield to the TMA members. Santa Maria, GSWC, and Guadalupe are allocated 80 percent and the stipulating landowners 20 percent. In exchange, the TMA is obligated to employ a management area engineer to prepare an annual report analyzing water supply and demand. The TMA must also engage an engineering consultant to develop "an integrated operation and maintenance procedure manual" for the Twitchell project and "provide recommendations for capital and maintenance projects" to maximize recharge of the Basin, including projects to address the accumulation of silt. The initial annual budget for the TMA is set to be between $500,000 and $700,000. These costs, and the cost of any extraordinary projects, are divided among the TMA members in proportion to their share of the Twitchell Yield. The District will continue to collect existing special assessments from all District landowners in order to fund routine operations and maintenance.

### C. Phase IV—Prescription and Twitchell Allocation

In light of the Stipulation, the phase IV trial involved only appellants and the public water producers. Among the issues to be tried were the prescriptive rights claims of the public water producers and the legality of the Stipulation's allocation of the Twitchell Yield. In its phase IV statement of decision, the trial court reversed its previous conclusion rejecting the public water producers' prescriptive rights claim. The trial court found that Basin groundwater levels had been declining between 1945 and the late 1960's and that statistical compilations of annual inflow, seaward outflow (which prevents salt water intrusion), and extractions demonstrated that "in all the years from 1944 through 1962 (and beyond)" extractions had substantially exceeded the "native yield." The court found that the undisputed evidence showed that, even though the Basin had not suffered permanent adverse effects, the Basin had been in overdraft at least during the years 1944 through 1951, 1953 through 1957, and 1959 through 1967, and, throughout those periods, Santa Maria and GSWC had continued to pump water. The court also found "that even after the Twitchell augmentation began, there have been periods in excess of the statute of limitations during which there has been no surplus in the basin" and these public water producers continued to pump. The court found that the other elements of prescription were proved and, therefore, Santa Maria and GSWC had established prescriptive rights in the native supply.

The trial court approved the allocation of the Twitchell Yield as set forth in the Stipulation, explaining that during years there is a surplus, "all water users have the right to use the water as overlying owners or appropriators." During times of shortage, when there is no surplus, the District "may regulate and allocate the appropriated water consistent with its contract and under the terms of the License" as allowed by Water Code sections 74501, 74526, and 74592.

### D. Phase V—Quiet Title and the Physical Solution

The final phase of the trial involved adjudication of appellants' quiet title claims and a determination of the effect of the trial court's previous finding of prescriptive rights. The trial court was also asked to decide whether it should impose the physical solution contained in the Stipulation and whether to enter a single judgment or enter judgment on the Stipulation separately.

The trial court concluded that the quiet title remedy was not available. Although appellants had submitted evidence to show that they had continued to pump as much water as they needed during the prescriptive periods, appellants had not submitted evidence from which the court could calculate the quantity of water they had pumped. Accordingly, the trial court held that it could not quiet title in any amount of groundwater. The court calculated the total volume of groundwater to which the prescriptive rights would attach and concluded that since the public water producers had waived their prescriptive rights against the stipulating landowners, only a fraction of the total would be enforceable against appellants.

The trial court approved the physical solution, explaining, "There is a reasonable certainty that the Basin will suffer water shortages in the future and that the court will be required to act in the future to preserve the rights of the various parties to this litigation in the event that Twitchell is not renovated and restored. Even if Twitchell is restored, there is a possibility that such shortages may occur," that the physical solution is "necessary and appropriate to provide for future exigencies," and its water management plan is "necessary and appropriate and will provide an efficacious solution to the Basin's current and future problems." As to allocation of the Twitchell Yield, the trial court held that no party had established a pre-Stipulation priority right to that water. The 80-20 allocation "does not affect any rights, contractual or otherwise, of the non-stipulating parties."[7]

---

[7] We shall expand upon the trial court's phase V statement of decision in our discussion of the issues below.

## IV. THE JUDGMENT

The trial court entered a single judgment on January 25, 2008, incorporating the Stipulation.[8] The judgment awards Santa Maria and GSWC prescriptive rights to native groundwater in the amount of 5,100 and 1,900 acre-feet per year, respectively. Only a fraction may be asserted against appellants. That fraction is equal to the ratio of appellants' rights to the total of all overlying rights within the Basin.[9] Because appellants had failed to sustain their burden of proof in their quiet title action, and "[a]ll other LOG and Wineman party causes of action having been dismissed," judgment was entered in favor of respondents on the quiet title causes of action.[10]

The judgment gives Santa Maria and GSWC the right to use the Basin for temporary storage and recapture of return flows generated from their importation of SWP water. The volume of return flows to which each is entitled is equal to 65 and 45 percent, respectively, of the volume of water they import. The Northern Cities are awarded "a prior and paramount right to produce 7,300 acre-feet of water per year from the Northern Cities Area of the Basin; and (b) the Non-Stipulating Parties have no overlying, appropriative, or other right to produce any water supplies in the Northern Cities Area of the Basin." As to the Twitchell Yield, the judgment states only: "No party established a pre-Stipulation priority right to any portion of that increment of augmented groundwater supply within the Basin that derives from the Twitchell Project's operation."

Although the Stipulation is not binding upon nonstipulating parties, the judgment independently requires appellants to "participate in and be bound

---

[8] The judgment consists of an eight-page document entitled "Judgment After Trial," the Stipulation, and all the exhibits to the Stipulation. Although the Stipulation is part of the judgment, we shall refer to it as the "Stipulation" and our further references to "judgment" are to the eight-page Judgment After Trial.

[9] By way of explanation, the judgment includes this example: "[I]f the cumulative usufructuary rights of the LOG and Wineman Parties were 1,000 acre-feet and the cumulative usufructuary rights of all other overlying groundwater right holders within the Basin were 100,000 acre-feet, [Santa Maria] and [GSWC] would each be entitled to enforce 1% of their total prescriptive right against the LOG and Wineman Parties. That is, [GSWC] could assert a prescriptive right of 19 annual acre-feet, and [Santa Maria] 51 annual acre-feet, cumulatively against the LOG and Wineman Parties, each on a proportionate basis as to each LOG and Wineman Party's individual use."

[10] The LOG parties contend that dismissal of their other causes of action was *without* prejudice. We reject the contention. The LOG parties asked for dismissal without prejudice after trial had commenced and after the trial court observed that they had not submitted any evidence on causes of action other than quiet title. After commencement of trial, dismissal without prejudice may be had if all affected parties consent or the court finds good cause for same. (Code Civ. Proc., § 581, subd. (e).) The LOG parties offer nothing to show that they met either condition.

by, the applicable Management Area Monitoring Program. Each Non-Stipulating Party also shall monitor their water production, maintain records thereof, and make the data available to the court or its designee as may be required by subsequent order of the court."

The judgment provides that the trial court shall retain jurisdiction to "make such further or supplemental orders as may be necessary or appropriate regarding interpretation and enforcement of all aspects of this Judgment, as well as clarifications or amendments to the Judgment consistent with the law." The Stipulation excludes from continuing judicial supervision several specified terms and includes an opt-out clause, which allows any party, upon motion and showing of good cause, to be released from the provisions of the judgment in the event of any material change to specified terms, including allocation of the Twitchell Yield.

## V. Issues

The LOG and Wineman parties have filed separate appeals from the judgment. The LOG parties appeal from certain posttrial orders, as well. We have sorted appellants' numerous arguments into four main categories: (1) physical solution, (2) prescription and quiet title, (3) developed water, and (4) postjudgment rulings. We also consider several miscellaneous challenges to the judgment. We shall include the details of all these arguments and further factual information as needed in the discussions that follow.

## VI. Standards of Review

The most fundamental rule of appellate review is that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 [80 Cal.Rptr.2d 378].) Where appellants challenge the sufficiency of the evidence we defer to the trial court. Our review is limited to whether there is substantial evidence contradicted or uncontradicted that will support the challenged factual finding. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766–767 [60 Cal.Rptr.2d 770].) When the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

Whether legal or factual, no error warrants reversal unless the appellant can show injury from the error. (*Douglas v. Ostermeier* (1991) 1 Cal.App.4th 729, 740 [2 Cal.Rptr.2d 594].) In order to demonstrate error, an appellant

must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C); *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 & fn. 16 [126 Cal.Rptr.2d 178]; *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 29–30 [96 Cal.Rptr.2d 553]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].) Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt. (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838]; Cal. Rules of Court, rule 8.204(a)(1)(B).) The larger and more complex the record, the more important it is for the litigants to adhere to appellate rules. (*Akins v. State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9 [71 Cal.Rptr.2d 314].)

In the present case we have more than 100 volumes of clerk's and reporters' transcripts. Appellants' briefs alone contain over 350 pages and recite over 100 points of error. Some of the discussion lacks reference to the record. Some arguments seem to be based upon a misreading of the judgment.[11] Other arguments omit any explanation of how the claimed error works against appellants' interests; still others fail to include any legal basis for the challenge. We decline to consider these arguments. Given the size of the record and the importance of the substantive claims that will occupy the remainder of this opinion, we summarily reject each contention that may be resolved by reference to the judgment and all of those unaccompanied by legal reasoning or an explanation of the prejudicial effect of the ruling. We consider below only those issues for which appellants have supplied some cogent argument and the legal basis for it.

## VII. The Physical Solution

Appellants contend that because the Basin is not presently overdrafted there is no need for a physical solution and the trial court had no power to impose one. We reject the argument.

The phrase "physical solution" is used in water rights cases to describe an agreed-upon or judicially imposed resolution of conflicting claims in a manner that advances the constitutional rule of reasonable and beneficial use of the state's water supply. This court has defined "physical solution" as

---

[11] For example, the LOG parties ask that we amend the judgment to show that respondents' right to return flows does not accumulate from one year to the next but the judgment already says that. (Page 14 of the Stipulation states: "Any portion of Return Flows that is not used in a given Year shall not be carried over into the following year.")

"an equitable remedy designed to alleviate overdrafts and the consequential depletion of water resources in a particular area, consistent with the constitutional mandate to prevent waste and unreasonable water use and to maximize the beneficial use of this state's limited resource." (*California American Water v. City of Seaside* (2010) 183 Cal.App.4th 471, 480 [107 Cal.Rptr.3d 529].) Although we may use physical solutions to alleviate an overdraft situation, there is no requirement that there be an overdraft before the court may impose a physical solution.

One early use of the phrase appears in *Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 365 [40 P.2d 486], where the plaintiffs, riparian landowners, argued that they were entitled to "the full flow of the stream . . . , without diminution, . . . and regardless of waste or surplus which such uses might entail . . . ." Referring to the newly adopted constitutional requirement of reasonable use, the Supreme Court rejected the plaintiffs' argument and reversed a judgment that had prohibited the City of Vallejo from storing and diverting some of the stream water for use by city residents. In remanding the matter the court directed: "[I]f a physical solution be ascertainable, the court has the power to make and should make reasonable regulations for the use of the water by the respective parties, provided they be adequate to protect the one having the paramount right in the substantial enjoyment thereof and to prevent its ultimate destruction, and in this connection the court has the power to and should reserve unto itself the right to change and modify its orders and decree as occasion may demand, either on its own motion or on motion of any party." (*Id.* at pp. 383–384.) Indeed, our Supreme Court has encouraged the trial courts to be creative in devising physical solutions to complex water problems to ensure a fair result consistent with the constitution's reasonable-use mandate. (*Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 574 [45 P.2d 972] (*Tulare*).)

So long as there is an "actual controversy," the trial court has the power to enter a judgment declaring the rights of the parties (Code Civ. Proc., § 1060) and to impose a physical solution where appropriate (*City of Lodi v. East Bay Mun. Dist.* (1936) 7 Cal.2d 316, 341 [60 P.2d 439] (*Lodi*)). "Each case must turn on its own facts, and the power of the court extends to working out a fair and just solution, if one can be worked out, of those facts." (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 560–561 [81 P.2d 533].) As respondents correctly point out, the court not only has the power but the duty to fashion a solution to insure the reasonable and beneficial use of the state's water resources as required by article X, section 2. (*Lodi, supra,* at p. 341.) The only restriction is that, absent the party's consent, a physical solution may not adversely affect that party's existing water rights. (Cf. *Mojave, supra,* 23 Cal.4th at pp. 1243–1244, 1250–1251.)

The Wineman parties argue that a physical solution is an extraordinary remedy and, as such, is not warranted unless clearly necessary. According to the Wineman parties, a physical solution is not necessary in this case because there is no current shortage and no substantial evidence that a shortage is foreseeable. Respondents disagree, pointing to the accumulation of silt in the Twitchell Reservoir and other evidence. Since the present controversy involves the right to pump groundwater, a resource that is essential to every conceivable type of development, we see no legal or logical reason to require evidence of a foreseeable water shortage before a court may impose a framework designed to monitor the groundwater supply and define responsibilities in the event a shortage is detected. The Wineman parties' conclusory argument contains no reason for refusing such relief.

The Wineman parties also challenge the delegation of decisionmaking authority to the TMA, arguing that it is an impermissible delegation of decisionmaking power to a directly involved participant in violation of the Fourteenth Amendment to the United States Constitution. The cases upon which the Wineman parties rely do not support the argument. In *State Board v. Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 448 [254 P.2d 29], the administrative body that set prices for dry cleaning was made up of a majority of dry cleaners. In *Blumenthal v. Board of Medical Examiners* (1962) 57 Cal.2d 228, 235–236 [18 Cal.Rptr. 501, 368 P.2d 101], licensed opticians had unlimited power to exclude others from the practice of optometry. In *People v. Belous* (1969) 71 Cal.2d 954, 960 [80 Cal.Rptr. 354, 458 P.2d 194], the physician asked to perform an abortion was required to interpret the abortion law to decide whether the procedure was legal. In each case the Legislature enacted a law giving decisionmaking power to persons whose interests *conflicted* with the interests of the persons (dry cleaning consumers, prospective licensees, women seeking abortions) who would be directly affected by the law. Here, the interests of the decisionmaking parties are aligned with appellants' interests. All Twitchell participants, the public water producers in particular, have an interest in optimizing Twitchell's recharge ability in order to avoid the restrictions that will be imposed in the event of a water shortage.[12] Appellants' interests are the same; there is no apparent conflict. And the court's continuing jurisdiction protects appellants from the possibility that a latent conflict could adversely affect them.

■ The LOG parties ask us to modify the judgment to clarify that they are not bound by the monitoring and management programs created by the

---

[12] The Stipulation uses "water shortage" rather than "overdraft" to describe the set of circumstances that will trigger action to ameliorate the shortage. In the Santa Maria Valley management area, in the event of a severe water shortage, as defined, public water producers will be limited to pumping their share of developed water only. The stipulating landowners will be allowed native groundwater plus any developed water to which they may be entitled. If conditions do not improve the court may impose further limitations.

Stipulation. No modification is necessary. The judgment independently requires the nonstipulating parties to "participate in and be bound by, the applicable Management area Monitoring Program," monitor their own water production, maintain records thereof, and make the data available to the court.[13] The LOG parties seem to argue that they cannot be bound by provisions they did not suggest, but they are wrong. "[I]t should be kept in mind that the equity court is not bound or limited by the suggestions or offers made by the parties to this, or any similar, action." (*Tulare, supra,* 3 Cal.2d at p. 574.) The court "undoubtedly has the power regardless of whether the parties have suggested the particular physical solution or not, to make its injunctive order subject to conditions which it may suggest . . . ." (*Ibid.*)[14]

Although appellants maintain that any physical solution is unnecessary, they also argue that the physical solution the trial court imposed is inadequate to protect the Basin. Appellants offer no conclusive evidence to support their contention. And there is substantial evidence to support the trial court's implied finding that the physical solution is designed to be effective protection. Hydrogeologist Robert Beeby stated that the Stipulation requires water experts to collect data and make recommendations to the court to address any concerns that the data uncovers. Beeby believed that under the management and maintenance principles set forth in the Stipulation, the water supply in the Basin will be sufficient to meet demand through 2030. Given the available supply, in the unlikely event that rain stopped falling altogether, the technical monitoring committees or management area engineers will have at least 15 years to figure out what to do. According to Beeby, implementation of the Stipulation "would make it highly unlikely that water levels would ever drop below sea level in both Nipomo Mesa Management Area and the Santa Maria Valley Management Areas."[15]

We conclude that the trial court did not err in approving the physical solution even though there is no present overdraft; delegation of decisionmaking authority to the TMA does not violate appellants' due process rights; and the evidence is sufficient to support the finding that the physical solution is designed to be effective in managing the groundwater supply.

---

[13] Groundwater monitoring is a priority for the Legislature as well. Water Code section 10920, subdivision (a) states the Legislature's intent that "on or before January 1, 2012, groundwater elevations in all groundwater basins and subbasins be regularly and systematically monitored locally and that the resulting groundwater information be made readily and widely available."

[14] The LOG parties also attack the Stipulation for failing to quantify rights in the native groundwater. We shall address the question of quantification in part VIII.E. below.

[15] Because appellants do not own land in the Northern Cities area, groundwater management in that area was not an issue at the phase IV or V trials.

## VIII. Prescription and Quiet Title

### A. Introduction

Appellants challenge the award of prescriptive rights to Santa Maria and GSWC, attacking the elements of the claim for insufficiency of the evidence and raising the affirmative defenses of laches and nonuse. We begin with the evidentiary arguments.

### B. Evidence of Adverse Use (Overdraft)

A prescriptive right in groundwater requires proof of the same elements required to prove a prescriptive right in any other type of property: a continuous five years of use that is actual, open and notorious, hostile and adverse to the original owner, and under claim of right. (*California Water Service, supra*, 224 Cal.App.2d at p. 726.) Since appropriators are entitled to only that part of the safe yield the overlying landowners do not need, "[t]he commencement of overdraft provides the element of adversity which makes the first party's taking an invasion constituting a basis for injunctive relief to the other party." (*San Fernando, supra*, 14 Cal.3d at p. 282.)

In phase III the trial court looked for physical manifestations of overdraft and, finding none (other than some subsidence in the Nipomo area, which the court concluded did not demonstrate Basin-wide overdraft), the court was satisfied that the Basin had not been in overdraft and, therefore, that the public water producers could not prove prescriptive rights. The court reversed itself in phase IV, noting that acquisition of a prescriptive right could be proved without a showing of a permanent groundwater reduction so long as pumping exceeded safe yield for five continuous years. Appellants argue that the court was correct the first time, but we believe that the court's final approach is the correct one.

Since appropriators are entitled to take water that is surplus to the reasonable beneficial needs of those with prior rights, the element of adversity cannot be satisfied if there is a water surplus: "A ground basin is in a state of surplus when the amount of water being extracted from it is less than the maximum that could be withdrawn without adverse effects on the basin's long term supply. While this state of surplus exists, none of the extractions from the basin for beneficial use constitutes such an invasion of any water right as will entitle the owner of the right to injunctive, as distinct from declaratory, relief. [Citations.] Overdraft commences whenever extractions increase, or the withdrawable maximum decreases, or both, to the point where the surplus ends. Thus on the commencement of overdraft there is no surplus available for the acquisition or enlargement of appropriative rights.

Instead, appropriations of water in excess of surplus then invade senior basin rights, creating the element of adversity against those rights prerequisite to their owners' becoming entitled to an injunction and thus to the running of any prescriptive period against them." (*San Fernando, supra,* 14 Cal.3d at pp. 277–278.)

Where there has been "an actual adverse user of water" in the Basin, there is an "invasion, to some extent at least, of the rights of both overlying owners and [senior] appropriators" commencing in the year the overdraft commenced. (*Pasadena, supra,* 33 Cal.2d at pp. 928–929.) As the Supreme Court explained in discussing prescriptive rights in the Raymond Basin: "Each taking of water in excess of the safe yield, whether by subsequent appropriators or by increased use by prior appropriators, was wrongful and was an injury to the then existing owners of water rights, because the overdraft, from its very beginning, operated progressively to reduce the total available supply. Although no owner was immediately prevented from taking the water he needed, . . . a continuation of the overdraft would eventually result in such a depletion of the supply stored in the underground basin that it would become inadequate. . . . [¶] The proper time to act in preserving the supply is when the overdraft commences, and the aid of the courts would come too late and be entirely inadequate if . . . those who possess water rights could not commence legal proceedings until the supply was so greatly depleted that it actually became difficult or impossible to obtain water." (*Id.* at p. 929.) In short, a basin does not need to become irreversibly depleted before an appropriator's use is adverse. The adversity element is satisfied by pumping whenever extractions exceed the safe yield.[16]

The trial court found in phase IV that there were "periods of five or more continuous years between 1900 and the present time during which there was no surplus, temporary or otherwise." Specifically, the trial court found that there was no surplus from "at least 1944-1951, 1953-1957, and 1959-1967." The evidence of historical overdraft—years when pumping exceeded the safe yield—is sufficient to support this finding. There was voluminous evidence, both documentary and testimonial, showing that extractions substantially exceeded the safe yield in the years cited by the trial court. By the 1960's, the cumulative deficit was in the hundreds of thousands of acre-feet. Appellants' only challenge to the evidence is the LOG parties' assertion that there was actually a surplus in 1962 and 1967. The assertion is based upon a water budget summary that shows total inflows for these two years was greater than

---

[16] The LOG parties are correct that when there is a temporary surplus, overdraft does not commence until extractions exceed the safe yield plus the volume of the temporary surplus. (*San Fernando, supra,* 14 Cal.3d at p. 280.) That is because a temporary surplus takes up storage space so that rainfall and potential streambed seepage wastes to the sea. A temporary surplus is the volume that would be wasted in such a situation. The point does not affect our analysis because there was no evidence of a temporary surplus in this case.

total outflows. The same document supports the trial court's conclusion that there was no surplus in the 1944 through 1951 and 1953 through 1957 time periods. Accordingly, even if there were two surplus years between 1959 and 1967, the evidence is sufficient to support the finding that there were five continuous of years of overdraft during the two earlier time periods.

## C. Evidence of Notice

To perfect a prescriptive right the adverse use must be "open and notorious" and "under claim of right," which means that both the prior owner and the claimant must know that the adverse use is occurring. In the groundwater context that requires evidence from which the court may fix the time at which the parties "should reasonably be deemed to have received notice of the commencement of overdraft." (*San Fernando, supra*, 14 Cal.3d at p. 283.) That can sometimes be difficult to prove. The Governor's Commission to Review California Water Rights Law, Final Report (1978) (Final Report)[17] pointed out the difficulty in its comprehensive evaluation of water law following the 1970's drought. On this point the Final Report notes: "While the 'openness' and 'hostility' of adverse possession of a static and well-defined resource such as land may fairly give notice to the owner of an adverse claim, the same is not true for water. One who holds a water right, in a common and fluctuating resource, may be put to the near impossible task of ascertaining whether a decrease in supply is caused by hydrologic factors, lawful uses by superior right holders upstream, or adverse use by a potential prescriptor." (Final Report, at p. 32.) In this case, however, the long-term, severe water shortage itself was enough to satisfy the element of notice.

On the issue of notice, the trial court stated, "The conditions of depleted water levels within the basin, during the drought years, were themselves well known, or should have been known, to all who used water within the basin. In short, the parties hereto and their predecessors in interest were on notice of the wide fluctuation in the water levels in the aquifer by virtue of the fluctuating well levels, the actions of political leaders, the Acts of Congress, and the public notoriety surrounding the need and the construction of the Twitchell project (as well as the Lopez project)." The evidence is sufficient to support these findings. Indeed, the shortage that had begun in the 1930's was severe enough that it literally took an act of Congress (Pub.L. 774) to remedy it. Other evidence of widespread knowledge that Basin extractions had been exceeding the safe yield included a 1951 report by the Bureau of Reclamation that identified a critical water shortage and noted that groundwater levels in 1936 had reached the lowest levels ever recorded. There was also the 1953

---

[17] <http://www.waterboards.ca.gov/publications_forms/publications/general/docs/1584a.pdf> (as of Nov. 21, 2012).

testimony before Congress by the District's president, which included his statement that the overall state of the groundwater "indicates a continuously diminishing supply and eventual exhaustion of the supply. [¶] This is obvious to those who are farming and irrigating the land and has been verified by every engineer who has studied the problem." At the local level, the SBCWA was formed in 1945 specifically to respond to persistent water shortage problems. This fact is sufficient on its own to support the conclusion that landowners were, by then, on notice that the Basin was in overdraft.

The LOG parties contend that reports and transcripts are hearsay and not admissible for the truth of their contents. (Evid. Code, § 1200.) The truth of the contents of the documents, i.e., the truth of the assertion that the Basin was in overdraft, is not the point. Other evidence proved that. The documents were offered to prove that the statements contained within them were made. That is not hearsay but is original evidence. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316 [94 Cal.Rptr.3d 198].) Respondents offered the documents as evidence that public statements were made and actions taken by local, state, and federal officials, demonstrating concern about depletion of the Basin's groundwater supply. The evidence supports the inference that appellants and their predecessors in interest had notice of the statements and, therefore, constructive notice of the commencement of a purported overdraft.

### D. Laches and Nonuse

The LOG parties maintain that the statute of limitations or the doctrine of laches bars claims of prescription arising from actions taken over 30 years ago. We reject the argument because the prescription doctrine does not require the adverse claimant to take any action to perfect a prescriptive right. "Occupancy for the [five-year] period . . . confers a title thereto, denominated a title by prescription, which is sufficient against all . . . ." (Civ. Code, § 1007.) It is the record owner's failure to act within the five-year period that matters. (Cf. *Marriage v. Keener* (1994) 26 Cal.App.4th 186, 191–192 [31 Cal.Rptr.2d 511]; see *Berger v. Horsfield* (N.Y.App.Div. 1919) 188 A.D. 649, 653 [176 N.Y.S. 854, 856] ["title gained by adverse possession rests upon the laches of the real owner, who fails to assert his title against the one claiming adversely . . . ."].)

The LOG parties also argue that given the long-term absence of an overdraft, any prescriptive rights previously acquired have been lost by nonuse. It is true that a prescriptive right can be lost by nonuse. Civil Code section 811, subdivision 4, provides that a servitude acquired by prescription is extinguished by "disuse thereof by the owner of the servitude for the

period prescribed for acquiring title by enjoyment."[18] The LOG parties maintain that, since perfection of a prescriptive right requires taking water that is not surplus, Santa Maria and GSWC cannot have exercised their prescriptive rights except in times of overdraft and, therefore, the absence of an overdraft for more than five continuous years has extinguished those prescriptive rights. Santa Maria and GSWC argue, in effect, that the prescriptive right is simply the right to take water out of the Basin and, since they have pumped continuously to the present time, they have never ceased using their prescriptive rights.[19]

 Subdivision 4 of Civil Code section 811 is an exception to the rule that a vested property right cannot be lost by the failure to use it. (*Strong v. Baldwin* (1908) 154 Cal. 150, 162 [97 P. 178].) Under this subdivision, a prescriptive right is extinguished solely as the result of disuse for the prescriptive period; evidence of intentional abandonment or adverse use by another is unnecessary. (*People v. Ocean Shore Railroad* (1948) 32 Cal.2d 406, 419 [196 P.2d 570]; see 6 Miller & Starr, Cal. Real Estate (3d ed. 2006) § 15:78, pp. 15-250 & 15-251 (rel. 8/2006).) This nonuser doctrine has been applied in cases relating to surface water as in *Garbarino v. Noce* (1919) 181 Cal. 125, 130 [183 P. 532], where the failure to take water from a ditch for 10 years resulted in the loss of a prescriptive right. (See *City of Los Angeles v. Pomeroy* (1899) 125 Cal. 420, 425 [58 P. 69].) We have found no case in which the doctrine has been applied to prescriptive rights in groundwater.

 It is true, as the LOG parties argue, that prescriptive rights in groundwater may be acquired only by taking water that is not surplus to the reasonable and beneficial needs of those with prior rights. According to the LOG parties, that means that one uses a prescriptive right only by taking nonsurplus groundwater. If that is so, then the right could not be used unless there is an overdraft and all unadjudicated prescriptive rights would be wiped

---

[18] Civil Code section 811 provides in full:
"A servitude is extinguished:
"1. By the vesting of the right to the servitude and the right to the servient tenement in the same person;
"2. By the destruction of the servient tenement;
"3. By the performance of any act upon either tenement, by the owner of the servitude, or with his assent, which is incompatible with its nature or exercise; or,
"4. When the servitude was acquired by enjoyment, by disuse thereof by the owner of the servitude for the period prescribed for acquiring title by enjoyment."

[19] Santa Maria and GSWC cite *Moore v. Cal. Oregon Power Co.* (1943) 22 Cal.2d 725 [140 P.2d 798] in support of their argument that the existence of a surplus merely precludes the expansion of their prescriptive rights. *Moore* supports the conclusion that the prescriptive rights Santa Maria and GSWC acquired are limited to their actual use during the prescriptive period. (*Id.* at p. 735 ["prescriptive rights are *stricti juris* and should not be extended beyond the actual user"].) The case does not speak to the question of what constitutes disuse of a prescriptive right in the groundwater context.

out whenever there was a continuous five years of surplus. This result might inject some badly needed certainty into water rights law. After all, an unadjudicated prescriptive claim cannot be discovered by inspecting title records or by examining water levels in a fully recharged basin. As the present case amply demonstrates, when the groundwater supply has been sufficient and stable for many years, unadjudicated prescriptive claims add a measure of uncertainty to the business of landowners and appropriators, which can inhibit long-range planning and investment and foster costly and piecemeal litigation. (*Wright v. Goleta Water Dist.* (1985) 174 Cal.App.3d 74, 86 [219 Cal.Rptr. 740].) The prescription doctrine was highlighted in the Final Report as one factor contributing to uncertainty in the area of water law. Indeed, the Final Report went so far as to propose eliminating the doctrine from water rights law, noting, among other things, that its use in water law exacerbates the lack-of-knowledge problem that hinders effective water planning, management, and enforcement. (Final Report, at p. 31.) But while the LOG parties' interpretation is appealing from an administrative standpoint, we think respondents' interpretation is analytically more accurate and is supported by other important public policy considerations.

 The question is this: What constitutes disuse of a prescriptive right in groundwater? To answer the question it will help to understand the nature of common law water rights. Common law water rights—the riparian, overlying, appropriative, and prescriptive rights—are usufructuary. A usufruct is "[t]he right of using and enjoying and receiving the profits of property that belongs to another . . . ." (Black's Law Dict. (6th ed. 1990) p. 1544, col. 2.) One commentator has explained that the usufructuary water right is the right to take water from the watercourse, or, as in our case, from the groundwater basin. (Anderson, *Water Rights as Property in* Tulare v. United States (2007) 38 McGeorge L.Rev. 461 (hereafter, Anderson).) "One uses a watercourse by diverting water from it. Diversion is the use, and the detached substance of the water is the 'fruit' that the running water yields . . . ." (*Id.* at p. 496, fn. omitted.) Anderson argues that this usufructuary right is separate from the right that attaches once the water is diverted from its source. That is, the usufructuary right "is a right to use a watercourse, to avail oneself of its fruits by diversion, which thereafter provides (1) an opportunity (2) to use beneficially (3) the diverted water. The former is the use entitled by the water right, the latter, the use that is enabled by its exercise." (*Ibid.*) "Thus, a water right holder 'uses' a watercourse in precisely the same way that the holder of a profit à prendre 'uses' a servient tenement: by taking material from it." (*Id.* at p. 496, fn. 115.)

The preceding analysis is consistent with our understanding of water rights law and is useful in analyzing the disuse issue before us. If, in the groundwater context, one uses the usufructuary common law water rights (overlying, appropriative, or prescriptive) by pumping the water out of the

ground, there is no disuse unless the person ceases pumping. The absence of a surplus is merely the circumstance that makes an appropriator's use adverse. (See *San Fernando, supra,* 14 Cal.3d at p. 282 ["The commencement of overdraft provides the element of adversity which makes the first party's taking an invasion constituting a basis for injunctive relief to the other party."].)

We recognize that acquiring a prescriptive right has no practical effect unless there is an overdraft. Acquisition of a prescriptive right in groundwater rearranges water rights priorities among water users, elevating the right of the one acquiring it above that of an appropriator to a right equivalent in priority to that of a landowner. (*San Fernando, supra,* 14 Cal.3d at p. 293.) But the effect of the right does not compel the conclusion that it is disused in times of surplus. It has been said that "the disuse mentioned in [Civil Code section 811] subdivision 4 means simply the failure to use the thing itself theretofore used." (*Strong v. Baldwin, supra,* 154 Cal. at p. 161.) The "thing itself theretofore used" is the right to extract water from the Basin. If exercise of a prescriptive right in groundwater required the continuous taking of nonsurplus water, exercise of the right during times of surplus would be impossible and "[t]he law never requires impossibilities." (Civ. Code, § 3531.)

We also recognize that, notwithstanding the recommendation of the Final Report, the Legislature has not abolished the prescription doctrine. It remains an established component of water rights law. And the Legislature has directed that we consider domestic use a higher use than irrigation (Wat. Code, § 106) and "that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for existing and future uses . . . ." (*Id.,* § 106.5.) Domestic and municipal users take water as appropriators. Many, such as Santa Maria, may have done so during years of overdraft, acquiring, in the process, prescriptive rights to the native supply upon which they would be bound to depend in the event of a future shortage. The LOG parties' interpretation would lead to an especially harsh result from the perspective of these preferred water users. Thus, even if the LOG parties' interpretation were a supportable alternative, Water Code sections 106 and 106.5 compel us to reject it.

We conclude that a prescriptive right in the groundwater context is a water right like any other; it is the right to take the water from the water source. It is not disused simply because the presence of a surplus makes assertion of its priority unnecessary.

### E. Quiet Title

As a general matter, an action for adjudication of groundwater rights may be styled as a quiet title action. (*City of L. A. v. City of Glendale* (1943) 23 Cal.2d 68 [142 P.2d 289] (*Glendale*).) The purpose of a quiet title action is to finally settle and determine the parties' conflicting claims to the property and to obtain a declaration of the interest of each party. (*Newman v. Cornelius* (1970) 3 Cal.App.3d 279, 284 [83 Cal.Rptr. 435].) The quiet title claimant has the burden of proof to show every element of the right claimed. (*Tulare, supra*, 3 Cal.2d at pp. 547–548.) The only evidence needed to prove an overlying right is evidence of title to the overlying land. (*California Water Service, supra*, 224 Cal.App.2d at p. 725 [an overlying right "is based on the ownership of the land and is appurtenant thereto"].) After the landowner has met that burden, the burden shifts to the person claiming prescriptive rights to show the validity of that claim. (Cf. *Tulare, supra*, at p. 548.) Landowners may limit prescriptive rights by showing that although they had not sought an injunction during the prescriptive period they exercised self-help by continuing to pump during that time. (*Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc., supra*, 23 Cal.App.4th at pp. 1731–1732.)

In the present case, appellants have title to the overlying land and Santa Maria and GSWC have valid prescriptive rights that attach to a specified volume of Basin groundwater. As to appellants' claim of self-help, the trial court found that "overall pumping by all water producers (overlying owners as well as appropriators) continued without reduction during the periods of severe drought . . . ." Appellants had, therefore, "retain[ed] the right to continue to take some water in the future, i.e., that amount pumped concurrently with the appropriator." Since appellants had made no attempt to show how much they had pumped during the prescriptive periods, the trial court concluded that it could not quiet title in appellants' overlying rights. Appellants argue that proof of the quantities they pumped during the long-ago prescriptive period was unnecessary. We agree with appellants.

It is true that evidence of the quantity of a landowner's reasonable and beneficial use is necessary in many cases. But quantification is required only when it serves some practical purpose. For example, when it is alleged that the water supply is insufficient to satisfy all users the court must determine the quantity needed by those with overlying rights in order to determine whether there is any surplus available for appropriation. (See, e.g., *Tulare, supra*, 3 Cal.2d at p. 525.) And it stands to reason that when there is a shortage, the court must determine how much each of the overlying owners is using in order to fairly allocate the available supply among them. But not every case requires quantification. (*Corona Foothill Lemon Co. v. Lillibridge* (1937) 8 Cal.2d 522, 531 [66 P.2d 443].) Where there are no conflicting

prescriptive rights, and sufficient safe yield to satisfy all parties, the trial court may simply declare the landowners' overlying rights to be superior to those of the appropriators. (Cf. *Glendale, supra*, 23 Cal.2d at pp. 72, 82 [the plaintiff's pueblo right declared superior to that of defendant cities].)

At the time of trial in this case there was no dispute that the Basin contained enough water for all users, so the trial court had no reason to calculate quantities at that point in time. On the other hand, appellants do not have unalloyed prior rights to take Basin groundwater since Santa Maria and GSWC have perfected prescriptive rights against them. By engaging in self-help, appellants did not acquire new rights in the particular volume of water they pumped; they retained their overlying rights, subject only to the volume of the prescriptive taking. As the Supreme Court directed, when "the total amount of water covered by all of the rights of the parties exceeds the available supply consisting of the basin's safe yield and any temporary surplus," overlying owners "should be awarded the full amount of their overlying rights, less any amounts of such rights lost by prescription, from the part of the supply shown to constitute native ground water." (*San Fernando, supra*, 14 Cal.3d at p. 294.) The full amount of the overlying right is that required for the landowners' "present and prospective" reasonable beneficial use upon the land. (*Mojave, supra*, 23 Cal.4th at p. 1240.) "As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises." (*Tulare, supra*, 3 Cal.2d at p. 525.) The prescriptive right, in contrast, is based upon the volume pumped during the prescriptive period. Prescriptive rights are limited to the amount of water actually taken. (*San Fernando, supra*, at pp. 285–286.)

The existence of a surplus makes this case different from most other basin adjudications. It is more like *Glendale* in that appellants would not have been entitled to injunctive relief because the Basin contained a surplus of water over and above that which appellants were using. (*Glendale, supra*, 23 Cal.2d at pp. 78–79.) In *Glendale*, the purpose of the action "was not to protect rights in water already being used—there then being enough water for all—but to preserve a potential right to water that would be required for plaintiff's future needs." (*San Fernando, supra*, 14 Cal.3d at p. 268, citing *Glendale, supra*, at pp. 74–75.) The plaintiff's quiet title action was the appropriate procedure for protecting against future prescriptive claims by appropriators. "For the purpose of protection against prescription, the declaratory judgment in *Glendale* was as effective as if it had explicitly restrained defendants from asserting any right to the water except in subordination to plaintiff's paramount right." (*San Fernando, supra*, at pp. 268–269.) The same is true here. Because there is presently enough water for all users, appellants' action for quiet title necessarily focused upon preserving their rights in the future. They have already lost the right to exclude Santa Maria

and GSWC from taking nonsurplus water equal to the volume of their prescriptive taking. They have not lost the right to exclude them from taking more than that. A declaration of their rights will effectively prevent further erosion of their prior rights.

There is a portion of the *San Fernando* opinion in which the Supreme Court sets forth a method for allocating the native supply between overlying and prescriptive rights holders. In that part the court states: "The effect of the prescriptive right would be to give to the party acquiring it and take away from the private defendant against whom it was acquired either (1) enough water to make the ratio of the prescriptive right to the remaining rights of the private defendant as favorable to the former in time of subsequent shortage as it was throughout the prescriptive period [citation] or (2) the amount of the prescriptive taking, whichever is less." (*San Fernando, supra*, 14 Cal.3d at p. 293, fn. omitted, citing *Pasadena, supra*, 33 Cal.2d 908 at pp. 931–933.) The first listed alternative suggests that the overlying owner retains only a proportionate share of the supply, which, if true, would require that we know how much the landowner pumped during the prescriptive period. However, as the appellate court noted in *Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc., supra*, 23 Cal.App.4th at page 1733, footnote 9, "after stating this equation, the [*San Fernando*] court specifically stated that the overlying owner would retain from the native groundwater all but amounts lost by prescription, while the rest of the available supply would be allocated among holders of appropriative and prescriptive rights. ([*San Fernando, supra*, 14 Cal.3d] at p. 294.)" Like the *Hi-Desert* court, we do not interpret this part of the *San Fernando* opinion as giving the overlying and prescriptive rights holders proportionate shares in the safe yield. As the Supreme Court has stressed, overlying owners retain their rights by pumping. (*San Fernando, supra*, at p. 293, fn. 100; *Mojave, supra*, 23 Cal.4th at p. 1253.) The overlying right extends to the landowners' "present and prospective" reasonable beneficial use upon the land (*Mojave, supra*, at p. 1240) and, therefore, that is the right, less the volume lost to prescription, preserved by self-help. Quantification of the overlying right is not necessary because there is no present need to allocate the native supply. Accordingly, appellants are entitled to a declaration that their overlying rights are prior to all but the prescriptive rights proved by Santa Maria and GSWC.[20]

---

[20] Guadalupe did not appear at the phase IV or V trials. The LOG parties ask us to enter a default judgment against Guadalupe. But a court has no power to order entry of default against a party who has answered. Where a defendant has answered the complaint and received notice of trial but does not appear, the plaintiff may proceed with his case uncontested. (Code Civ. Proc., § 594; *Merrifield v. Edmonds* (1983) 146 Cal.App.3d 336, 341 [194 Cal.Rptr. 104].) Since we have concluded that appellants are entitled to a judgment quieting title in them, that conclusion applies to Guadalupe to the same extent it applies to the other respondents. But it is not a default judgment.

## IX. DEVELOPED WATER

The preceding discussion of overlying and prescriptive rights concerned native groundwater. We now turn to the issues related to developed water— return flows and salvaged water.

### A. Return Flows

#### 1. The Importer's Right to Return Flows

The judgment gives respondents the prior right to quantities of groundwater attributable to return flows of imported water. The LOG parties maintain that respondents can have no prior right to return flows, citing Water Code section 1202, subdivision (d), which defines unappropriated water as "[w]ater which having been appropriated or used flows back into a stream, lake or other body of water." According to the LOG parties, this means that return flows are unappropriated and available for use by anyone. Although Water Code section 1202 undoubtedly defines unappropriated water, it applies only to *surface* water, which is not the problem before us. And the reference to water flowing "back into" the stream, lake or other body of water implies that the section does not refer to imported water in any event.

█ The more pertinent code section is Water Code section 7075, which provides that water that has been appropriated "may be turned into the channel of another stream, mingled with its water, and then reclaimed; but in reclaiming it the water already appropriated by another shall not be diminished." Although this section specifically refers to adding and reclaiming imported water from a stream, the Supreme Court has interpreted it as applying to imported water added to and withdrawn from an underground basin. (*San Fernando, supra*, 14 Cal.3d at p. 260, citing *Glendale, supra*, 23 Cal.2d at pp. 76–77.) It means that one who brings water into a watershed may retain a prior right to it even after it is used. (*Glendale, supra*, at pp. 76–77.) The practical reason for the rule is that the importer should be credited with the "fruits . . . of his endeavors in bringing into the basin water that would not otherwise be there." (*San Fernando, supra*, at p. 261; see *Hoffman v. Stone* (1857) 7 Cal. 46, 49.) The jurisprudential basis for it involves the property law concepts we mentioned earlier.

█ A usufructuary water right is the right to take water from the water source; the water source is the property and the water itself is the "profit" or

---

We also note that only some of the nonstipulating landowners pleaded quiet title causes of action. Our ruling naturally applies only to those who did.

fruit thereof. (Anderson, *supra*, 38 McGeorge L.Rev. at p. 496.) Once an appropriator diverts the water from the stream or pumps it from the ground, the right to the substance of the water is no longer usufructuary. Although the appropriator does not own the water in the sense of having title to the individual water molecules, the appropriator does have "the sole and exclusive right to use the same for the purposes for which it was appropriated." (*Hoffman v. Stone, supra*, 7 Cal. at p. 49.) That is a type of possessory right. (Anderson, *supra*, at pp. 488–489.) Water Code section 7075 invokes this second kind of right in allowing an appropriator to retain an interest in appropriated water that the appropriator brings from one stream or basin and adds to another. As described by our Supreme Court, the right to return flows of imported water "is an *undivided right to a quantity of water* in the ground reservoir equal to the net amount by which the reservoir is augmented by such deliveries." (*San Fernando, supra*, 14 Cal.3d at p. 262, italics added.) Thus, the importers of SWP water may retain a right to the volume of water made available through their efforts. That right is separate from others' usufructuary rights in the Basin's native supply.

The LOG parties argue that importers are not entitled to return flows unless their pumping stations are downgradient from the place where the water percolates into the basin. In the *Glendale* and *San Fernando* cases upon which the LOG parties rely, the Supreme Court found that the City of Los Angeles was entitled to credit for return flows of water it had imported because its conduct—selling or spreading the water in areas where it would be sure to percolate into the city's groundwater basin—showed that the water was not abandoned and that the city had intended to recapture the water. This result did not turn upon the fact that the city's pumping stations happened to be downgradient from where the water was introduced. (See *Glendale, supra*, 23 Cal.2d at pp. 76–78; *San Fernando, supra*, 14 Cal.3d at pp. 255–262.) To the contrary, both courts clarified that the right to return flows does not attach to the particular water molecules. "The fact that spread water is commingled with other ground water is no obstacle to the right to recapture the amount by which the available conglomerated ground supply has been augmented by the spreading." (*San Fernando, supra*, at pp. 263–264, citing *Glendale, supra*, at pp. 76–77 & Wat. Code, § 7075.)[21]

---

[21] The LOG parties also argue that under Water Code section 1210, the owner of the wastewater treatment plant has the paramount right to the treated wastewater. They raise the argument for the first time on appeal. Accordingly, we decline to consider it. (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 [8 Cal.Rptr.3d 840].)

## 2. Evidence of Return Flow Rights in the Santa Maria Valley Area

The judgment gives Santa Maria priority credit in groundwater equal to 65 percent of the SWP water it imports. It gives GSWC credit for 45 percent of its imports. Appellants argue that because the figures are based upon the total volume of wastewater sent to percolation ponds, the estimates do not take into account evaporative losses and, therefore, do not represent the *net* amount by which the imported water augments the Basin's supply. We reject the argument.

The trial court's calculations are based upon data showing that approximately 65 percent of the imported water (or 45 percent in the case of GSWC) flows into the sewers and on to the wastewater treatment plants after it is used. The rest of the imported water is used in a way that it does not end up in the sewer system, such as landscape irrigation "or other outdoor uses." Civil engineer Robert Wagner testified that in calculating return flows the engineers do not try to ascertain evaporative losses or return flows from outdoor uses. These amounts are minor and are believed to offset each other. "Some [return flow] gets in there we don't measure; some gets out we don't measure and they equal out." This is sufficient evidence to support the return-flow calculations in the judgment. The calculations are, after all, estimates.

## B. Developed Water in the Northern Cities Area

The judgment awards the Northern Cities "a prior and paramount right to produce 7,300 acre-feet of water per year from the Northern Cities Area of the Basin." The calculation of that amount is found in the trial court's phase IV statement of decision. There the trial court found that "5200 acre feet a year are piped directly to the Northern cities, and return flows averaging 400 acre feet per year are generated by the Northern Cities' use of this water. In addition, approximately 300 acre feet per year are added to the aquifer as a result of the timed releases from the Lopez Reservoir into Arroyo Grande Creek. [¶] The Northern Cities purchase and import an average of 1200 acre feet annually from the State Water project, which saves pumping from the aquifer. Their use of this imported water also augments the groundwater supply by approximately 100 acre feet per year of return flows. [¶] The Northern Cities constructed six percolation ponds to capture runoff of rainfall and prevent it from wasting to the ocean. These percolation ponds augment the groundwater supply in the Northern Cities Area by approximately 100 acre feet per year." The court also found that the nonsettling landowners "did not claim or prove that they own any land in the Northern Cities Area."

The LOG parties argue that the trial court erred in awarding 7,300 acre-feet of *groundwater* when the evidence is that some of the water was piped directly from the Lopez Reservoir or imported from the SWP. But the judgment is not limited to groundwater rights; it awards rights in water "from the Northern Cities area of the Basin." The trial court's statement of decision makes it clear that the court did not intend that the 7,300 acre-feet be taken from the ground and the Northern Cities do not argue otherwise. Northern Cities agree that 5,300 of the 7,300 acre-feet is a prior right to *surface* water pumped from the reservoir. And the 1,200 acre-feet figure is SWP water they import.[22]

As to the groundwater components of the award, the LOG parties argue that as a matter of law "[s]alvaged water creates no groundwater right." But as we shall explain below, that is not the law. The LOG parties also contend that the trial court's calculations of return flows were erroneous because they did not take evaporation into account. We reject this argument for the same reason we rejected it above.

### C. Salvaged Water

#### 1. The Right to Salvaged Water

 Simply stated, salvaged water is water that is saved from waste as when winter floodwaters are dammed and held in a reservoir. As is the case with return flows, a priority right to salvaged water belongs to the one who made it available. This is not a new rule. In *Pomona etc. Co. v. San Antonio etc. Co.* (1908) 152 Cal. 618, 620 [93 P. 881], it was determined that from one point on a stream to the point at which the plaintiffs accessed the stream for their supply the stream naturally lost 19 percent of its flow to seepage, percolation, and evaporation. The defendant installed a dam at the upper point, claimed 19 percent of the flow, and sent the rest downstream to the plaintiffs in a pipe. (*Ibid.*) The plaintiffs claimed a right to some of the salvaged 19 percent but the Supreme Court rejected the claim holding that, so long as the plaintiffs received the water to which they were entitled, the waters that were "rescued" by the defendants "were essentially new waters, the right to use and distribute which belonged to defendant." (*Id.* at p. 623.)

There is no dispute that appellants have overlying rights to pump native groundwater from the Basin. But the priority of the overlying right does not extend to water made available by the efforts of another. Salvaged water may

---

[22] Contrary to the LOG parties' contention on appeal, the Northern Cities did seek a declaration of their rights in surface water; their cross-complaint specifically requests a declaration of their "rights to use and store the waters conserved by the Lopez Reservoir."

be native to the extent it would naturally flow within the stream to which it is released but it is "foreign in time." (See Attwater & Markle, *Overview of California Water Rights and Water Quality Law* (1988) 19 Pac. L.J. 957, 966.) It would not find its way into the Basin absent a reclamation project to divert it, store it, and release it on a schedule to augment natural recharge. It is rescued water; the rescuer has the prior right to it.

### 2. The Twitchell Yield

The Twitchell Yield is the roughly 32,000 acre-feet per year the Twitchell project adds to the Basin that would not be there otherwise; it is salvaged water. Appellants argue that the trial court expressly found the Twitchell Yield to be native groundwater and that we should modify the judgment to make that clear. The argument takes the court's findings out of context.

The trial court found and the judgment states that no party had a pre-Stipulation right to the Twitchell Yield. This conclusion is correct. The Bureau of Reclamation holds the appropriative right to the water, having acquired the right by license from the SWRCB. The Bureau of Reclamation is the appropriator that rescued the water and, therefore, the right to use and distribute the water belonged, initially, to the Bureau of Reclamation. (Cf. *Pomona etc. Co. v. San Antonio etc. Co., supra,* 152 Cal. at p. 623.) Pursuant to its contract with the SBCWA, the District makes the water available to the Basin. No water-using party had any pre-Stipulation priority right to the water entering the Basin as a result of appropriation of Cuyama River water by the Bureau of Reclamation or the District's operation of the Twitchell project.

Appellants' contention that the trial court found the Twitchell Yield to be native groundwater is based upon a remark contained in the phase V statement of decision. Following the phase V trial, the trial court found that no party had proved a pre-Stipulation right to the Twitchell Yield and that the 80–20 allocation to the stipulating parties, "does not affect any rights, contractual or otherwise, of the non-stipulating parties. Further, enforcement of the stipulation's Twitchell allocation, as between the stipulating parties, does not adversely affect the rights to native ground water of any non-stipulating parties. The correlative rights of non-stipulating parties to native ground water will remain unaffected by the stipulation, subject only to the court's findings of the legal consequence of those prescriptive rights held by some Public Water Producers and the court's equitable jurisdiction. *Twitchell water, once released for recharge, retains its character as native water.* [¶] In the final judgment, the court will exclude the nonstipulating parties from the allocation of the Twitchell project as imposed in the stipulation. It would be premature for the court to order an allocation of water produced by Twitchell

as to parties who are not party to the stipulated agreement and there is no basis for doing so." (Italics added.)

Appellants rely upon the italicized sentence to support their contention that the trial court found the Twitchell Yield to be native groundwater. The trial court's comment may have been derived from a statement in *Glendale, supra,* 23 Cal.2d at pages 71 through 72. *Glendale* concerned the right to water in the basin underlying the San Fernando Valley. That basin, like this one, held native groundwater, return flows, and salvaged waters. The trial court had awarded Glendale a priority right to the salvaged water but the Supreme Court reversed, finding that Los Angeles's pueblo rights were paramount: "The fact that this water was made available by the Los Angeles Flood Control District does not determine its ownership. The district makes no claim to the water, and plaintiff's pueblo right affords no basis for an objection to any use of water that does not decrease plaintiff's supply, for such uses do not diminish the pueblo right. [Citations.] If this water was subject to the pueblo right before it was impounded by the district, it remained pueblo water despite the erection of the dams, so that the water abandoned by the district was subject to the right." (*Id.* at pp. 73–74.) The court concluded by stating: "Moreover, waters that are released to rejoin the body of water of which they are naturally a part are treated as natural parts of such streams. (*Crane* v. *J. J. Stevinson, Inc.* [(1936)] 5 Cal.2d 387, 400 [54 P.2d 1100]; *Southern Cal. Investment Co.* v. *Wilshire* [(1904)] 144 Cal. 68, 73.)" (*Id.* at p. 74.)[23]

The point of *Glendale* was that both the stream and the basin were subject to the pueblo right. Because the water had been impounded from and returned back into bodies of water over which Los Angeles had paramount rights, and since the entity that had made it available abandoned it, the water remained subject to the pueblo right. (*San Fernando, supra,* 14 Cal.3d at p. 248, fn. 39, citing *Glendale, supra,* 23 Cal.2d at pp. 73–74.) This case is different. Pueblo rights are not at issue here and not one of the parties has a prior right to Cuyama River water. Furthermore, the District does not necessarily abandon the water when it is released. The license obtained by the Bureau of

---

[23] The cases from which *Glendale* derived the rule stated at the end of the cited passage are of questionable support for the statement in that they were not salvaged water cases. *Crane v. Stevinson, supra,* 5 Cal.2d at page 400, involved the diversion of water from the San Joaquin River for irrigation purposes. That which drained back into the San Joaquin was still part of the San Joaquin such that the downstream landowner retained a riparian right to it. The same situation existed in *Southern Cal. Investment Co. v. Wilshire, supra,* 144 Cal. at page 73. The water was used, abandoned, and allowed to flow back into the stream from which it was first taken. This is exactly what happens when a landowner pumps groundwater to irrigate overlying fields. The water percolates back into the basin to rejoin the native groundwater of which it was naturally a part. Salvaged water is different in that it would not naturally be a part of the groundwater supply; it would have wasted to the sea absent the intentional collection, storage, and timed release of the water for the purpose of adding to the natural supply.

Reclamation expressly contemplates that the water will be stored underground in that it specifies the water may be withdrawn from surface storage, "charged to underground storage," and later withdrawn and placed to beneficial use. Unlike many reclamation projects, the Twitchell project was not designed to deliver water from the aboveground reservoir. One house committee report on Public Law 774 described the project as "unusual" in that "all holdover storage would be maintained in the ground-water reservoir, as indicated above, and no surface-water deliveries would be made to irrigators." Thus, when the District releases the water it does so for the purpose of storing it underground.

 We do not interpret the trial court's comment to mean that the Twitchell Yield is native groundwater subject to appellants' overlying rights because that would directly conflict with the terms of the judgment and all the other findings the trial court made. If we were to interpret the remark as appellants interpret it, we would be bound to reject it as legally inaccurate. The Twitchell Yield is salvaged water to which overlying rights do not attach. Indeed, as the trial court correctly held, no party proved any prior right to the Twitchell Yield. Respondents obtained their rights to the Twitchell Yield by virtue of the District's agreement set forth in the Stipulation. The District has the statutory and contractual power to enter into such an agreement. As a general matter, the Water Code gives the District the power to "appropriate, acquire, and conserve water and water rights for any useful purpose" (Wat. Code, § 74521), to "conserve, store, spread, and sink water . . ." (*id.*, § 74522), and to "sell, deliver, distribute, or otherwise dispose of any water that may be stored or appropriated, owned, or controlled by the district" (*id.*, § 74526). The Water Code further provides that the water conservation districts may "make contracts and do all acts necessary for the full exercise of its powers" (*id.*, § 74501). This explicit statutory authority, coupled with the authority set forth in the relevant contracts, allows the District to allocate water "stored or appropriated, owned, or controlled" by it so long as the allocation is consistent with the controlling statutory and contractual obligations and does not offend the common law rights of the nonstipulating parties.

### 3. *The Federal Irrigation Preference*

The Wineman parties argue that allocating 80 percent of the Twitchell Yield to the public water producers to be used for municipal and industrial purposes conflicts with the federal preference for irrigation found in 43 United States Code sections 521 and 485h (sections 521 and 485h). These sections do not apply here. These sections allow the Secretary of the Interior (Secretary) to enter into contracts for the sale or lease of surplus water for

purposes other than irrigation (§ 521)[24] and for new projects "to furnish water for municipal water supply or miscellaneous purposes" under specified circumstances (§ 485h, subd. (c)).[25] The Wineman parties point to the provision in both sections requiring the Secretary to first find that the transaction would not be detrimental to the irrigation aspects of the projects involved. According to the Wineman parties, the trial court neglected to make that finding here. The finding was unnecessary because these sections apply only to contracts between the Secretary and the project operator. The allocation of the Twitchell Yield among the users of project water is not such a contract. (Cf. *San Luis Unit Food Producers v. U.S.* (E.D.Cal. 2011) 772 F.Supp.2d 1210, 1233.) Indeed, neither the District-area landowners nor the public water producers have any contractual relationship with the Bureau of Reclamation. Typically it is the water user's relationship with the project operator that defines the user's right to project water. (Roos-Collins, *Voluntary Conveyance of the Right to Receive a Water Supply from the United States Bureau of Reclamation* (1987) 13 Ecology L.Q. 773, 846.) The Reclamation Act (43 U.S.C. § 371 et seq.) has very little to say about that relationship.

State water law controls the distribution of reclamation water so long as that distribution is not " 'inconsistent with other congressional directives to the Secretary.' " (*Strawberry Water Users Assn. v. U.S.* (10th Cir. 2009) 576 F.3d 1133, 1148 (*Strawberry*), quoting *Israel v. Morton* (9th Cir. 1977) 549 F.2d 128, 132–133.) As the Wineman parties correctly assert, agriculture has always had first claim on the water supply provided by the

---

[24] Title 43 United States Code section 521 provides: "The Secretary of the Interior in connection with the operations under the reclamation law is authorized to enter into contract to supply water from any project irrigation system for other purposes than irrigation, upon such conditions of delivery, use, and payment as he may deem proper: *Provided*, That the approval of such contract by the water-users' association or associations shall have first been obtained: *Provided*, That no such contract shall be entered into except upon a showing that there is no other practicable source of water supply for the purpose: *Provided further*, That no water shall be furnished for the uses aforesaid if the delivery of such water shall be detrimental to the water service for such irrigation project, nor to the rights of any prior appropriator: *Provided further*, That the moneys derived from such contracts shall be covered into the reclamation fund and be placed to the credit of the project from which such water is supplied."

[25] Subdivision (c) of 43 United States Code section 485h provides in pertinent part: "The Secretary is authorized to enter into contracts to furnish water for municipal water supply or miscellaneous purposes: *Provided*, That any such contract [shall require repayment to the United States under specified terms]: *Provided further*, That in said sales or leases preference shall be given to municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrification Act of 1936 [7 U.S.C. § 901 et seq.]. . . . No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes."

Bureau of Reclamation pursuant to the Reclamation Act. But later amendments to that act authorized the use of reclamation water for nonirrigation purposes and, as significant here, Congress may allow additional uses when it authorizes individual projects. (Coggins & Glicksman, 4 Public Natural Resources Law (2d ed. 2011) Limitation on the Use of Reclamation Project Water, § 36:12.)

The Wineman parties rely upon *Strawberry, supra*, 576 F.3d at page 1148, which held that the project operator could not divert project water to municipal and industrial use without approval of the secretary. But the project in *Strawberry* was among the earliest of the reclamation projects, having been authorized in 1905 expressly for irrigation. (*Id.* at p. 1136; see *In re Uintah Basin* (Utah 2006) 133 P.3d 410, 416.) The Twitchell project was commenced nearly a half century later and in its enabling legislation Congress described the project as designed for "irrigation and the conservation of water, flood control, and *for other purposes*." (Pub.L. No. 774, ch. 1258 (Sept. 3, 1954) 68 Stat. 1190, italics added.) Furthermore, the contract between the Bureau of Reclamation and SBCWA specifies that the Bureau of Reclamation would not begin construction "until and unless water rights *for project purposes satisfactory to the Secretary* of the Interior have been acquired or assured . . . ." (Italics added.) The Bureau of Reclamation submitted two applications for permits to appropriate water; one requested water for "irrigation, domestic, salinity control, and incidental recreation" uses; the other requested water for "municipal and industrial" uses. The permit that was issued expressly allows for all these uses as does the license pursuant to which the Bureau of Reclamation continues to appropriate Cuyama River water. Since Congress explicitly authorized multiple uses for Twitchell water and the Bureau of Reclamation implicitly approved municipal and industrial uses by requesting and receiving the right to appropriate water for those purposes, allocation of a portion of the Twitchell Yield to municipal and industrial users does not represent a change in use for which federal law requires concurrence of the Secretary.

### 4. The Legality of Preferring One Class of Consumers

Citing *Leavitt v. Lassen Irrigation Co.* (1909) 157 Cal. 82 [106 P. 404] (*Leavitt*), the Wineman parties argue that common law precludes the District from preferring one water user over another. There is no unlawful preference here. In *Leavitt,* the owner of an irrigation company granted a single landowner a right to water prior to all other consumers. (*Id.* at p. 87.) *Leavitt* held that one holding the water in trust for the public " 'must supply all alike who are like situated, and not discriminate in favor of nor against any.' " (*Id.* at p. 90.) But as the court further explained: "All are equally entitled to share in the use of the water who pay, or offer to pay, the legal rate

and to abide by the reasonable rules and regulations of the company." (*Ibid.*) In *Madera Irr. Dist. v. All Persons* (1957) 47 Cal.2d 681 [306 P.2d 886] (*Madera*), the Supreme Court, quoting from *Leavitt, supra,* at pages 89 through 90, reaffirmed the rule: " ' "Whenever water is appropriated for distribution and sale, the public has a right to use it, that is, each member of the community, by paying the rate fixed for supplying it, has a right to use a reasonable quantity of it, in a reasonable manner." ' " (*Madera, supra,* at p. 692.) The point is that water suppliers must apply the same rules to all consumers. The District did that here. By entering into the Stipulation, the District allocated the Twitchell Yield to all the parties willing to pay the expense connected with the monitoring and management program and to be bound by the other terms of the Stipulation.

### 5. The Judgment Is Unclear

Implicit in appellants' arguments is their contention that the Twitchell allocation gives respondents a priority right to more groundwater than they are entitled to have. As we read it, the Stipulation gives the Twitchell participants a priority right in a precalculated volume of 32,000 acre-feet per year, whether or not any capital improvements have been implemented and even if the amount of water the Twitchell project actually contributes to the Basin diminishes over time. At oral argument, counsel for respondents clarified that the Stipulation's allocation of the Twitchell Yield merely allows the Twitchell participants to characterize the first 32,000 acre-feet they take as salvaged water, which means they will not be charged with extracting any part of the native supply until they have pumped the full Twitchell Yield. But the Twitchell participants are not entitled to claim a priority right in a volume of salvaged water greater than that which is actually saved because that would invade the supply to which appellants have a prior right. The Twitchell participants are collectively entitled to characterize as salvaged water no more than the actual amount by which Twitchell has augmented the Basin supply. The judgment should be modified to reflect this limitation.

### X. POSTJUDGMENT ISSUES

The LOG parties objected to four postjudgment rulings approving ground-water monitoring plans for the Nipomo, Northern Cities, and Santa Maria Valley management areas and a Water Shortage Condition and Response Plan submitted by Nipomo. The LOG parties argued that the entire action was stayed pending resolution of this appeal. When the trial court rejected the argument the LOG parties petitioned this court for a writ of supersedeas to prevent the trial court from ruling on the motions. This court denied the petition and the trial court approved the four plans. On appeal, the LOG parties maintain that the trial court's orders are void because the entire matter was stayed.

The rule is that "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).) The purpose of the automatic stay "is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided." (*Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629 [5 Cal.Rptr.2d 742].) "In determining whether a proceeding is embraced in or affected by the appeal, we must consider the appeal and its possible outcomes in relation to the proceeding and its possible results." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189 [25 Cal.Rptr.3d 298, 106 P.3d 958].) A postjudgment proceeding that is ancillary or collateral to the appeal is not stayed "if the proceeding could or would have occurred regardless of the outcome of the appeal." (*Id.* at p. 191.) If the postjudgment proceedings would not affect the effectiveness of the appeal, the proceedings are permitted. (*Id.* at p. 189.)

None of the possible outcomes of this appeal would have any effect upon the challenged postjudgment orders nor would those postjudgment orders make the appeal itself ineffective. Each of the postjudgment rulings would have or could have occurred regardless of the outcome here. The trial court made it quite clear that its orders approving the monitoring programs concerned only "those who have adopted" those plans. The LOG parties do not challenge respondents' right to establish monitoring programs. At best they argue that it was unnecessary for the trial court to make those programs part of this judgment. But even if we were to agree with that argument, the stipulating parties could nevertheless have sought judicial enforcement of the agreement as among themselves either via Code of Civil Procedure section 664.6 or a common law contract action. And as to the management plan submitted by Nipomo, the LOG parties have not contested any aspect of the Stipulation that applies to the Nipomo water management area. Whatever we were to decide about prescriptive rights, the Twitchell Yield, return flows, or the authority of the TMA, it would not have affected or been affected by approval of Nipomo's Water Shortage Condition and Response Plan.

As to the LOG parties' substantive challenge to the postjudgment orders, there is a vague and perfunctory reference on page 144 of the opening brief to arguments "incorporated herein." The absence of any cogent discussion of the alleged error convinces us that the claim does not warrant review.

## XI. CONCLUSION

To recap, we conclude that the trial court acted within its discretion in approving a physical solution notwithstanding the absence of a current

overdraft. The evidence is sufficient to support the trial court's finding Santa Maria and GSWC perfected prescriptive rights by at least 1948. The failure to exercise prescriptive rights during times of surplus does not amount to disuse within the meaning of Civil Code section 811, subdivision 4.

■ The trial court erred in refusing to quiet title in appellants. Appellants are entitled to a judicial declaration confirming that their overlying rights to the native groundwater are prior to that of all appropriators less the amounts to which Santa Maria and GSWC are entitled pursuant to their prescriptive rights. In light of our conclusion on this point, the trial court shall reconsider its prevailing party determination and the allocation of costs.

The evidence is sufficient to support the trial court's calculation of return flow rights in the Santa Maria Valley management area. The trial court did not err in finding that the Northern Cities have prior rights to 7,300 acre-feet per year of water produced by the Lopez project, which includes a prior right to 5,200 acre-feet piped directly from the Lopez Reservoir and 1,200 acre-feet per year of imported SWP water, as well as 700 acre-feet per year of salvaged water and return flows stored in the underground Basin.

The trial court correctly determined that the District has the power to allocate the Twitchell Yield among users consistent with its contractual and statutory authority and that the allocation does not offend the prior rights of appellants. As written, however, the judgment could allow respondents to characterize 32,000 acre-feet per year as salvaged water whether or not the Twitchell project continues to augment the Basin to that extent. On remand, the trial court is directed to modify the judgment to clarify that rights to the Twitchell Yield shall not invade appellants' overlying rights to native groundwater.

The four postjudgment matters upon which the trial court ruled during the pendency of this appeal were not stayed by the appeal. We have deemed the LOG parties' substantive challenge to those orders to be abandoned.

## XII. Disposition

The judgment is reversed. The matter is remanded to the trial court with instructions to modify the judgment as follows:

As to those appellants that pleaded quiet title causes of action, the court shall declare their overlying rights to native groundwater prior to the rights of all appropriators less the amount to which the City of Santa Maria and Golden State Water Company are entitled pursuant to their prescriptive rights and shall reconsider, if necessary, the prevailing party determination and allocation of costs.

As to respondents' rights to groundwater added to the Basin by operation of the Twitchell project (the Twitchell Yield), the trial court shall modify the judgment to clarify that such rights shall not invade appellants' overlying rights.

The parties shall bear their own costs on appeal.

Elia, J., and Grover, J.,* concurred.

A petition for a rehearing was denied December 21, 2012, and the opinion was modified to read as printed above. The petition of appellant Richard E. Adam for review by the Supreme Court was denied. February 13, 2013, S207708.

---

*Judge of the Monterey Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.